974 F.2d 1449
 36 Fed. R. Evid. Serv. 1190
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Michael Merrill GREENWOOD, Lucy Mason Crain, a/k/a Maggie
Lou Crain, a/k/a Miss Lucy, Doyle D. Oliver and
J.W. Myers, Defendants-Appellants Cross-Appellees,
and
Steve Ellis and Robert Raul Estrada, Defendants-Appellants.
 No. 91-8212.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 2, 1992.
 
 Richard D. Esper, El Paso, Tex. (Court-appointed), for Greenwood.
 Salvador C. Ramirez, Robert R. Harris, El Paso, Tex., for Estrada.
 Henry J. Bemporad, Asst. Federal Public Defender, San Antonio, Tex., Lucien B. Campbell, Federal Public Defender, El Paso, Tex., for Crain.
 Norbert J. Garney, El Paso, Tex. (Court-appointed), for Oliver.
 Thomas A. Coleman, Ackerman, Miss., for Myers.
 Richard Mesa, El Paso, Tex. (Court-appointed), for Ellis.
 Mark R. Stelmach, Richard J. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for U.S.
 Appeals from the United States District Court for the Western District of Texas.
 Before VAN GRAAFEILAND,* KING, and EMILIO M. GARZA, Circuit Judges.
 KING, Circuit Judge:
 
 
 1
 This appeal is from two related drug trials involving an overlapping cast of defendants who participated in two separate conspiracies spread out over all three states within this circuit as well as Mexico. The first trial revolved around a marijuana conspiracy; the second, a methamphetamine conspiracy. Defendants-appellants Greenwood, Ellis, Estrada, and Crain appeal from their convictions at the marijuana trial.[1] Defendants-appellants Greenwood, Crain, Oliver, and Myers appeal from their convictions at the methamphetamine trial.[2] We affirm all of the appellants' convictions.
 
 
 2
 The Government also cross-appeals from each of the four sentences imposed at the methamphetamine trial. The Government contends that the district court erred in holding that the four defendants could be sentenced only pursuant to a statutory provision governing schedule III controlled substances in view of the Government's description of methamphetamine as a schedule III controlled substance in the indictment. The Government notes that methamphetamine is in fact a schedule II substance, for which the district court could have imposed--under a different statutory provision than the schedule III sentencing provision actually relied on--considerably harsher sentences. The four methamphetamine cross-appellees counter that this Court does not have jurisdiction over the Government's cross-appeal of the sentences because the Government failed to file its notices of cross-appeal within the thirty days authorized by Federal Rule of Appellate Procedure 4(b). At issue is whether the Government's motions for reconsideration of the sentences filed within the original thirty-day appeals period started Rule 4(b)'s thirty-day clock running anew after the district court denied the Government's motions. If so, the Government's cross-appeals filed within thirty days from the denial of the motions were timely. We hold that we do have jurisdiction over the Government's cross-appeal. We, therefore, vacate the district court's sentences and remand for resentencing.
 
 I. FACTUAL BACKGROUND
 A. The marijuana conspiracy
 
 3
 On January 15, 1990, at the Bridge of the Americas port of entry in El Paso, Texas, the suspicions of a United States Customs Service inspector were aroused by an eighteen-year old driver of a Chrysler Cordoba who wished to come into the United States from Mexico. The extremely nervous young man, Robert Estrada, did not have a driver's license, possessed a $500 roll of cash, and claimed to be bringing nothing back from Mexico. Because the back seat of his automobile was unusually firm, customs agents removed it and discovered over 100 pounds of packaged marijuana hidden beneath. Agents also found various documents in the vehicle that made reference to one "Luis Liano" and his various automotive businesses in El Paso and Juarez, Mexico. Estrada denied prior knowledge of the marijuana, stated that he worked for Liano, and--changing his story--claimed that he went to Mexico in order to pick up auto parts, which were in the car's trunk. Estrada was then arrested.
 
 
 4
 A month later, on February 14, 1990, another Chrysler Cordoba attempted to enter the United States through the same port of entry in El Paso. Neither the driver, Donald Stone, nor the passenger, Michael Greenwood, possessed identification. Agents observed that Greenwood appeared nervous. When they ran his social security number through a law enforcement database, they discovered that he had an outstanding warrant for a marijuana charge. A search of Stone's person revealed that he was carrying approximately $500. Customs agents searched under the back seat of the car and once again discovered over 100 pounds of marijuana packaged in an identical fashion to the marijuana found in Estrada's Cordoba. Stone and Greenwood told agents that they had borrowed the car from Estrada.
 
 
 5
 After his arrest, Stone, a professional trucker, agreed to cooperate with the Government in exchange for a promise of nonprosecution. He informed authorities--and later jurors--that he was part of a operation smuggling marijuana from Mexico into the United States. Stone further implicated Estrada. According to Stone, not only did Estrada locate sources of marijuana in Mexico for Liano, but also he helped prepare vehicles for smuggling. Stone claimed that Estrada had made at least one other smuggling run from Juarez to El Paso, on which he was accompanied by Stone and Greenwood. In great detail, Stone also told how he and Greenwood had planned and carried out the February 14th smuggling trip.
 
 
 6
 Also implicated in the larger conspiracy were Lucy Crain, a manager of a Texas truck stop, and Steve Ellis, a Mississippi trucker. Stone claimed that Crain's truckstop served as a way station for truckers who smuggled marijuana and that Crain herself served as a messenger for smugglers. Stone stated that Crain had relayed messages to Ellis, who drove a truck containing approximately 100 pounds of marijuana, during a successful smuggling run in January 1990. Stone also claimed that Crain was a marijuana dealer and that she had sold Stone as much as thirty-three pounds of marijuana at a time. As further evidence of Crain's role in the marijuana conspiracy, the Government offered physical evidence that it had seized after a search of Crain's home--including gram scales, a marijuana tester kit, and marijuana seeds.
 
 
 7
 Stone's wife, who also served as a Government witness, testified at trial that during one of Crain's many visits to the Stones' home, Crain openly spoke of her involvement in the marijuana conspiracy. Mrs. Stone observed that Crain possessed "envelopes full of money with a bunch of figures on the outside"; one of the envelopes had the name "Mike Greenwood" written on it. Mrs. Stone also claimed that she heard Crain, Mr. Stone, and Greenwood discussing marijuana deals and prices. Finally, Mrs. Stone stated that Ellis had made repeated phone calls to the Stones' residence requesting to speak to Mr. Stone and asking for "his money and his dope," which supposedly referred to Ellis' remuneration for the smuggling trip that Ellis had made for the conspiracy in early January 1990.
 
 
 8
 Another cooperating witness for the Government was Gayla Koehler, a former girlfriend of Greenwood. She described many occasions when she had accompanied Greenwood in his truck as he hauled marijuana. She recounted in detail two specific instances of smuggling--one in January 1989 when Greenwood picked up marijuana from Crain, which Greenwood transported to Mississippi for further distribution, and a second in February or March of that same year when the two picked up a load of marijuana from Liano and again transported it to Mississippi. Koehler testified that on a number of occasions she overheard Greenwood and Crain discussing hundred-pound loads of marijuana, which had been unloaded at Crain's truckstop. Finally, Koehler wore a secret recording device which recorded, inter alia, Crain's expression of her fear that Stone, who had been arrested at that point, would implicate Crain in the smuggling operation.
 
 
 9
 Another Government witness was Roger Hefner, a co-conspirator who agreed to cooperate in exchange for a reduction of his charges to a misdemeanor count. Hefner, who had been introduced to Greenwood through Crain, testified that on January 10, 1990, he had permitted Greenwood to store marijuana on Hefner's property. Hefner further claimed that he had earlier purchased one and two-pound quantities of marijuana from Greenwood and Liano. Hefner also testified that he had assisted Crain in operating her legitimate truckstop business, but would occasionally take messages for her concerning her marijuana deals. Some of those messages were from Greenwood.
 
 B. The methamphetamine conspiracy
 
 10
 Stone testified that he and Greenwood had been employed as truck drivers for a trucking company owned by co-conspirator J.W. Myers. Stone claimed that Myers would supply the methamphetamine to Stone and Greenwood in order to keep them awake during long hauls. Stone also recounted an incident during which Stone accompanied Greenwood to a meeting with Myers where Greenwood sold Myers an ounce of methamphetamine.[3] The agreed-upon price was $1300; Myers promised to pay the amount from the proceeds that he hoped to receive from selling the drug. Stone further testified in detail that, during the period spanned by the indictment, May 1989-May 1990, Greenwood and Crain, working together, engaged in methamphetamine distribution. According to Stone, Greenwood admitted to Stone that Greenwood and Crain had jointly sold ten and a half ounces of methamphetamine "in 1989" and that Greenwood was angry that Crain had not given Greenwood his share of the proceeds. Stone's wife similarly claimed that Crain had told her that Greenwood suspected Crain of cheating him out of "drug money." Stone also testified that on numerous occasions Crain had either given or sold him methamphetamine in one ounce amounts.
 
 
 11
 Greenwood's former girlfriend, Koehler, testified that she frequently had observed Greenwood in possession of methamphetamine and that on a number of occasions she had witnessed transfers of methamphetamine between Greenwood and Meyers. Koehler also testified that she answered Greenwood's telephone on numerous occasions when Crain called; Crain would then converse with Greenwood about selling methamphetamine. On another occasion, Koehler witnessed the actual transfer of an ounce of methamphetamine between Greenwood and Crain.
 
 
 12
 Elizabeth Richardson, a former assistant manager of Crain's truckstop, testified that Crain had introduced her to methamphetamine, which Richardson used throughout her employment. Richardson frequently witnessed Crain distribute methamphetamine to truck drivers during the period covered by the indictment. Crain's method of distribution was to dissolve the drug into the truckers' coffee. A local deputy sheriff testified that during this time he regularly observed numerous truckers who stopped at Crain's truckstop for long periods of time but who did not purchase fuel.
 
 
 13
 Stone's wife testified that Greenwood would frequently visit the Stones' Mississippi residence and that at least on one occasion Greenwood openly discussed Myer's desire to purchase methamphetamine from Greenwood. Soon thereafter, Mrs. Stone answered a phone call for Greenwood from Myers. Crain and Greenwood also visited the Stones' residence during the Thanksgiving holiday in 1989. Mrs. Stone stated that she heard Greenwood and Crain discuss making a telephone call to co-conspirator Doyle Oliver, who lived in Louisiana, in order to arrange a methamphetamine sale. Mrs. Stone claimed that Crain in fact telephoned a place that Crain identified as a residence "where Doyle was staying" and that the unidentified person on the other end of the line was asked if "everything was still set." Telephone company records confirm that Crain's telephone credit card was used on that date to make a long-distance call from the Stones' Mississippi residence to the Louisiana residence of Connie Johnston, then Oliver's girlfriend. Johnston testified that Oliver was a major methamphetamine dealer and that she had observed many of his transactions. Johnston also testified at trial that Oliver was present at her residence during the Thanksgiving holiday in 1989. Johnston claimed that she overheard Oliver's telephone conversation with an unidentified caller, and that the discussion "sounded like they were talking about buying a quantity of drugs." Johnston claimed that shortly after the phone call she observed Greenwood and Crain in Louisiana. According to Stone, Crain asked Johnston where Oliver could be found.
 
 
 14
 Louisiana police searched Oliver's residence. Oliver voluntarily led agents to a stash of approximately a kilogram of methamphetamine. Oliver's telephone directory, which was seized, contained entries for Myers and Crain. Texas police likewise searched Crain's residence where a number of incriminating items were seized--gram scales commonly used in drug distribution, a self-titled written formula for methamphetamine, and a grinders containing methamphetamine residue. Crain's telephone directory contained entries for Oliver and Myers.
 
 II. DISCUSSION
 A. Appeals from the marijuana trial[4]
 1. Estrada
 
 15
 Estrada raises only one claim on appeal: whether there was constitutionally sufficient evidence to support his convictions of possession of marijuana, importation of marijuana, conspiracy to possess more than 100 kilograms of marijuana with the intent to distribute, and conspiracy to import more than 100 kilograms of marijuana. We begin by noting the familiar standard of review of sufficiency claims, which was articulated by the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)--whether, based on the totality of evidence at trial, and all reasonable inferences therefrom, and in a light most favorable to the Government, a rational juror could find all elements of an offense beyond a reasonable doubt.
 
 
 16
 With respect to Estrada's possession and importation convictions, we believe that there was sufficient evidence. To begin with, there is no dispute that he was the driver and only occupant of a car that contained over 100 pounds of marijuana hidden under the back seat. If he in fact knew the drugs were on board and intentionally drove into the United States from Mexico, he is guilty of importation as well as possession. See United States v. Martinez-Mercado, 888 F.2d 1484, 1491 (5th Cir.1989). The evidence that Estrada was in control of the car permits an inference that he knew that the illicit substance was on board. United States v. Richardson, 848 F.2d 509, 513 (5th Cir.1988) (knowledge of the presence of controlled substance "may ordinarily be inferred from the exercise of control over the vehicle in which it is concealed"). However, merely linking Estrada to the vehicle is not by itself sufficient to establish beyond a reasonable doubt that he knew the car contained marijuana, in view of the fact that the drugs were hidden out of sight; there must be additional evidence to prove the element of knowledge, without which the Government may not constitutionally convict of possession of narcotics. See United States v. Price, 869 F.2d 801, 804 (5th Cir.1989); United States v. Olivier-Becerril, 861 F.2d 424, 427 (5th Cir.1988). We find that there was circumstantial evidence to show that Estrada knew that the car contained marijuana: Estrada's extreme nervousness displayed when he was questioned by customs agents and his inconsistent statements given regarding whether he had brought anything from Mexico. See United States v. Muniz-Ortega, 858 F.2d 258, 259-60 (5th Cir.1988). Moreover, after Stone and Greenwood were arrested the following month, it became quite clear that Estrada was no innocent participant in the Liano smuggling operation. His many other smuggling activities, which were recounted by Stone, are further evidence offered to jurors that Estrada possessed knowledge that the marijuana was hidden in the car that he was driving. See Fed.R.Evid. 404(b) (other crimes admissible to show intent, knowledge).
 
 
 17
 To facilitate our review of Estrada's (as well as the other appellants') conspiracy convictions, we first note some basic principles of the law of conspiracy. To link a defendant to a conspiracy, the Government must prove beyond a reasonable doubt that a conspiracy existed and that the defendant knowingly and voluntarily joined it. See, e.g., United States v. Rodriguez-Mireles, 896 F.2d 890, 892 (5th Cir.1990). The gravamen of a drug conspiracy offense is the agreement to violate a drug law. See United States v. Davis, 666 F.2d 195, 201 (5th Cir.1982). An express, explicit agreement is not required; a tacit agreement will suffice. See United States v. Prieto-Tejas, 779 F.2d 1098, 1103 (5th Cir.1986). One may be guilty as a co-conspirator even if he or she plays only a minor role, id., and that person need not know all the details of the unlawful enterprise or know of the exact number or identity of all the co-conspirators, so long as in some fashion he or she knowingly participates in the larger conspiratorial objectives, see United States v. Fernandez-Roque, 703 F.2d 808, 814-15 (5th Cir.1983); United States v. Sutherland, 656 F.2d 1181, 1190 (5th Cir.1981). Because secrecy is the norm in an illicit conspiracy, the elements of the offense may be established solely by circumstantial evidence. See United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir.1988); United States v. Bobo, 586 F.2d 355, 368 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979). So long as it is not facially insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the Government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict. See United States v. Lindell, 881 F.2d 1313, 1322 (5th Cir.1989), cert. denied sub nom. Kinnear v. United States, 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990).
 
 
 18
 Applying these legal principles to our sufficiency review under Jackson v. Virginia leaves us confident that there was more than a constitutional minimum of evidence necessary to support Estrada's two conspiracy convictions. A month after Estrada's arrest for attempting to smuggle over 100 pounds of marijuana into the United States, Stone and Greenwood, driving a Cordoba with marijuana hidden in precisely the same fashion as the marijuana hidden in Estrada's Cordoba, were arrested at the same port of entry. Stone implicated Estrada in the larger smuggling operation. Stone testified that Estrada had taken Stone and Greenwood on "scouting trips" into Mexico and showed the two various sources of marijuana which could be smuggled into the United States. Stone further testified that the three men also engaged in at least one successful smuggling run from Mexico into the United States.
 
 
 19
 As a part of his sufficiency claims, Estrada also argues that there was a "fatal variance" between the indictment's particular allegations of a conspiracy and the actual proof offered at trial.[5] See United States v. Richerson, 833 F.2d 1147, 1152 (5th Cir.1987) (variance between indictment and proof at trial is reversible error if it affects defendant's substantial rights). Specifically, Estrada argues that the evidence at trial did not sufficiently link Estrada to the broader conspiracy involving such co-conspirators as Crain and Ellis. While the evidence only directly linked Estrada to Liano, Greenwood, and Stone, as noted, a conspirator need not know the identity of all the members of the conspiracy so long as he or she knows that the criminal enterprise implicates others. See Fernandez-Roque, supra. A rational jury could find beyond a reasonable doubt that Estrada had to have been aware that Liano's smuggling operation involved others besides Estrada, Liano, Greenwood, and Stone. After all, common sense dictates that someone ultimately would be distributing the various hundred-pound loads of marijuana which Estrada had helped smuggle into the United States. See United States v. Mitchell, 777 F.2d 248, 259-60 (5th Cir.1985) (conspiring to distribute an illicit substance is a classic example of a conspiracy in which "each member had to have realized that the conspiracy extended beyond his individual role"), cert. denied, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986).
 
 
 20
 Finally, Estrada claims that Stone's pivotal testimony about Estrada's role in the conspiracy was inconsistent and otherwise incredible as a matter of law. Although we agree that Stone's extensive testimony contained a number of inconsistencies, especially with respect to dates, we are concerned only with the sufficiency, not the weight, of the evidence. Assessing the credibility of witnesses and weighing the evidence is the exclusive province of the jury. See United States v. Garner, 581 F.2d 481, 485 (5th Cir.1978). Because we cannot say that Stone's testimony is facially insubstantial or incredible, we find the evidence supporting Estrada's conspiracy convictions was constitutionally sufficient.
 
 2. Ellis
 
 21
 Ellis raises three claims on appeal: i) that there was constitutionally insufficient evidence to prove beyond a reasonable doubt that he conspired to possess in excess of 100 kilograms of marijuana with the intent to distribute; ii) that a significant variance existed between the indictment and the evidence introduced at trial; and iii) the district court erred in refusing Ellis' request for a lesser-included instruction on the offense of conspiracy to possess a quantity of marijuana less than 100 kilograms.
 
 
 22
 a. Insufficiency of the Evidence
 
 
 23
 Echoing Estrada, Ellis claims that a rational jury could not have relied upon the incriminating testimony of Stone and his wife regarding Ellis' role in the conspiracy because of major inconsistencies in the couple's testimony, the fact that the two were serious drug users, and Stone's purported motive to lie. As we noted in connection with Estrada's sufficiency claim, whether judges doubt the credibility of a witness, even an accomplice cooperating with the Government, is beside the point in reviewing a sufficiency claim such as this--with the exception of cases where a witness' testimony is so incredible or insubstantial that, as a matter of law, we may discredit it. Such cases, however, are extremely rare. They typically involve testimony about an event that could not have occurred "under the laws of nature." See, e.g., United States v. Osum, 943 F.2d 1394, 1405 (5th Cir.1991). After carefully reviewing the record, we simply cannot say that the inconsistencies in Stone's testimony rose to the level of being insubstantial or incredible as a matter of law. Although in the middle of his trial testimony Stone changed his story regarding the date of Ellis' involvement, Stone offered a plausible explanation for his earlier mistake, which jurors obviously accepted. Moreover, Mrs. Stone's testimony, while at times vague and inconsistent, corroborated her husband's claims.
 
 
 24
 b. Variance between the indictment and proof
 
 
 25
 In a related claim, Ellis contends that the proof of the scope of the conspiracy offered at trial was in fatal variance with the allegations in the indictment. Ellis argues that a reasonable jury could not have found that all of the alleged co-conspirators named in the indictment "were engaged in one common enterprise, rather than independent activities." United States v. Elam, 678 F.2d 1234, 1247 (5th Cir.1982). Ellis claims that there were in fact two discrete conspiracies: one involving Ellis, Greenwood, Stone, and another involving Greenwood, Stone, Crain, Estrada, and Liano. Ellis correctly points out that, according to the Government's evidence, Ellis' only direct involvement in any conspiratorial activities was in early January 1990. Ellis thus contends that he was convicted of being part of the larger conspiracy as a result of an impermissible finding of "guilt by association" simply because he was in the trucking business with Stone and Greenwood, who were concurrently involved in another, larger conspiracy. Ellis claims "his" conspiracy was short in duration and did not involve co-conspirators such as Liano and Estrada.
 
 
 26
 Viewing the evidence in the light most favorable to the Government, which we must, see Guzman v. Lensing, 934 F.2d 80, 82 (5th Cir.1991), we disagree. Stone testified that Ellis had, prior to his actual involvement in January 1990, asked to participate in the smuggling operation but was not given the job originally because another trucker was hired instead. This is testimony from which a reasonable jury could infer that Ellis knew that the smuggling operation that he wished to join was an on-going criminal enterprise which involved others besides Stone and Greenwood. Stone also testified that Crain relayed messages to Ellis, which further belies Ellis' claim that "his" conspiracy did not involve others. A reasonable jury could find that while Ellis' actual involvement was limited to smuggling approximately 40 kilograms of marijuana during a discrete time period, he was aware that the conspiracy in which he participated was a much larger criminal enterprise, which involved other persons and whose criminal objective was to possess over 100 kilograms of marijuana with the intent to distribute. Blackletter conspiracy law permits a finding of vicarious liability if there is sufficient evidence supporting a reasonable inference that a minor participant such as Ellis was on notice that a larger conspiracy existed, even if the specifics of the larger operation were unknown. See United States v. Prieto-Tejas, 779 F.2d 1098, 1103 (5th Cir.1986); United States v. Watson, 594 F.2d 1330, 1337 (10th Cir.1979); United States v. Sperling, 506 F.2d 1323, 1342 (2d Cir.), cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Moreover, a conspiracy to distribute a controlled substance is a prime example of a conspiracy in which each member "had to have realized that the conspiracy extended beyond his individual role." United States v. Mitchell, 777 F.2d at 259-60.[6]
 
 
 27
 c. Entitlement to a lesser-included offense
 
 
 28
 Finally, Ellis argues that the district court committed reversible error by refusing to submit Ellis' requested lesser-included offense instruction to the jury. Ellis requested an instruction on conspiracy to possess less than 100 kilograms of marijuana with the intent to distribute. Although his trial counsel was hardly clear at the time, Ellis apparently requested this instruction based on his above-mentioned theory that there were two conspiracies. We hold that the district court was correct in refusing Ellis' lesser-included offense instruction. Although a defendant is entitled to such an instruction whenever there is any evidence rationally supporting acquittal of the greater and conviction of the lesser offense, see Schmuck v. United States, 489 U.S. 705, 716 n. 8, 109 S.Ct. 1443, 1450 n. 8, 103 L.Ed.2d 734 (1989) (citing Keeble v. United States, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973)), Ellis did not ask for a lesser-included offense charge. Rather, he sought a lesser-included punishment charge. The statute which Ellis conspired to violate, 21 U.S.C. § 841(a), does not include the amount of illicit substance possessed as an element of the offense. Rather, the quantity possessed is relevant only under the penalty provision in § 841(b). Thus, even under the ordinarily permissive standard for entitlement to a lesser-included offense instruction, Ellis was not entitled to such an instruction in the instant case. See United States v. Sotelo-Rivera, 931 F.2d 1317, 1318-19 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1186, 117 L.Ed.2d 428 (1992).
 
 
 29
 Furthermore, even if the quantity of marijuana were considered an element of the offense, we have previously rejected the claim of entitlement to a lesser-included offense instruction when a conspiracy defendant argues, as his theory of defense, that multiple conspiracies existed rather than the single broad conspiracy alleged in the indictment. As we stated in United States v. Erwin, 793 F.2d 656 (5th Cir.1986), cert. denied, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986):
 
 
 30
 The basic theory of conspiracy is vicarious liability.... "The gist of the crime ... and characteristic which defines its breadth is the unlawful agreement." [citation omitted]. A co-conspirator cannot limit his participation to only part of that agreement; "once a defendant becomes associated with a conspiracy, he is responsible for all acts of it." [citation omitted]. Where the multiple objectives of a single alleged conspiracy are adequately proved by the evidence, a lesser included offense instruction is unnecessary; there is only one offense: conspiracy. The question for the jury is whether or not each defendant, in fact, agreed to join the particular conspiracy described in the indictment; the jury need not decide that any defendant is, instead, guilty of a different conspiracy involving a different agreement and fewer or less serious objectives.
 
 
 31
 Id. at 664 (emphasis added). Because there was sufficient evidence that Ellis was properly on notice that he was participating in a larger conspiracy involving unidentified others, he had no right to a lesser-included offense instruction.
 
 B. Appeals from the methamphetamine trial
 1. Greenwood
 
 32
 Greenwood raises two claims on appeal: i) that the evidence was constitutionally insufficient to support his conviction of intimidating a witness; and ii) that the evidence was constitutionally insufficient to support his conviction of conspiracy to possess methamphetamine with the intent to distribute.
 
 
 33
 a. Witness tampering
 
 
 34
 The Government alleged that Greenwood threatened cooperating witness Stone three times, twice directly and once indirectly though Stone's wife. Stone testified that on February 15, 1990, while Stone and Greenwood were in nearby jail cells, Greenwood informed Stone that Greenwood knew that Stone "had signed a statement and if [Stone] squealed it would come out in court and [Greenwood would] hate to be in [Stone's] shoes." Greenwood further stated that if Stone cooperated with authorities, "they" would kill Stone. Stone's wife testified that Greenwood had phoned her on the same day and had repeated the same statements, most notably that "they" would kill Stone if he became an informant. Finally, according to Stone, on February 21, 1991, while the two men were seated beside each other in a federal magistrate's courtroom, Greenwood once again warned Stone that if he "squealed," "they" would retaliate. The Stones each told jurors that he or she took these threats seriously; Mr. Stone testified that he felt intimidated particularly in view of alleged prior acts of violence committed by Greenwood which he had witnessed.
 
 
 35
 Greenwood does not argue that the statements did not constitute intimidation under the relevant statute, 18 U.S.C. § 1512, which proscribes the knowing use of intimidation to influence "official proceedings." Rather, Greenwood argues the statute is inapplicable because he did not intend his threats to influence "official proceedings.[7] This argument lacks merit. First, although Greenwood's threats were made before a trial commenced, the statute is explicit that "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(e)(1). Second, at least one of Greenwood's threats was made after "official proceedings" had begun; indeed, it was made in the magistrate's courtroom. Third, the express language of one of Greenwood's threats--warning that if Stone "squealed ... it would come out in court," which would result in retaliation--was an unabashed attempt to use intimidation to influence an official proceeding.
 
 
 36
 b. Sufficiency of the Evidence
 
 
 37
 Although he does not challenge the sufficiency of his marijuana convictions, Greenwood does challenge the sufficiency of the evidence to support his conviction of conspiracy to possess methamphetamine with the intent to distribute. Greenwood submits that "in the present case, the government established [only] a pattern of methamphetamine use among truckers in general and specifically among appellant, [Crain] and Meyers.... However, the sharing of contraband by two (or more) individuals is not itself evidence of intent to distribute." Cf. United States v. McIntyre, 836 F.2d 467, 471 (10th Cir.1987) ("There is no indication that defendant was making a profit or distributing cocaine when he merely shared his purchases with his friends at the time of the sale.") We reject Greenwood's interpretation of the evidence. Testimony from Stone, Stone's wife, and Greenwood's former girlfriend, Koehler, offered ample evidence from which a rational jury could find that a methamphetamine conspiracy existed, which involved a shared intent to distribute. Repeatedly, as the evidence indicated, methamphetamine was transferred for remuneration. On at least one occasion, according to Stone, Myers expressed his intention to sell methamphetamine that was supplied to him by Greenwood for $1300. There was sufficient evidence to support Greenwood's conviction of conspiracy to possess methamphetamine with the intent to distribute.
 
 2. Crain
 
 38
 Crain raises three major issues on appeal: i) that there was a fatal variance between the indictment and the evidence offered at trial to support her methamphetamine conspiracy conviction; ii) that the police engaged in an unconstitutional search and seizure; and iii) that the district court twice committed reversible error by permitting the Government to introduce inadmissible and highly prejudicial evidence.
 
 
 39
 a. Variance between the indictment and proof at trial
 
 
 40
 Crain argues that the evidence at trial showed at least two discrete conspiracies, one revolving around Crain's Texas truckstop and another centered in Louisiana that was spearheaded by Oliver. Crain contends that the only nexus between Oliver and the Crain conspiracy was that the latter once bought methamphetamine from the former, but that the purchase did not evince any common scheme or plan. As we will discuss more thoroughly, infra, with respect to Oliver's sufficiency claim, we hold that it is reasonable to include Oliver as a part of the Crain conspiracy. As we repeatedly noted in our discussion of the marijuana conspiracy, there is no requirement under the established law of conspiratorial liability that each co-conspirator must know the number or identity of the other members of the conspiracy. He or she must only be on reasonable notice of the larger objective of the conspiracy--to possess methamphetamine with the intent distribute--which was true in the case of a large-scale methamphetamine middle-man such as Oliver.
 
 
 41
 b. Fourth Amendment claim
 
 
 42
 Crain also claims that police lacked probable cause to search her home, where numerous incriminating items relating to both the marijuana and methamphetamine conspiracies were seized and ultimately introduced at trial. Crain argues that the affidavit supporting the search warrant did not provide probable cause.
 
 
 43
 The affidavit was sworn by an experienced agent of the United States Customs Service. It recited that "two cooperating sources" had conveyed incriminating information about Crain--that Crain was involved in the distribution of marijuana and methamphetamine, which she stored in her home and brought to her truckstop for purposes of sale. One of the informants also claimed that Crain had told him that she had frequently stored drugs in her house and forgot where she hid them. The magistrate was also informed of the secretly tape-recorded conversation between Crain and Koehler, in which Crain incriminated herself. In that conversation, Crain expressed her fear that Stone, who had already been arrested, would provide information to the authorities about Crain's involvement in the drug operation. Furthermore, at the time that the warrant was issued, Crain had already been indicted and arrested for conspiracy to violate federal drug laws.
 
 
 44
 Crain objects to the affidavit on the basis that the information in it was "stale" at the time that the warrant was actually issued. This claim is premised primarily on the fact that Crain's recorded statement, in which she noted her fear that she could be implicated by Stone, occurred on March 7, 1990, and the warrant was issued approximately two months later, in early May. Crain argues that the only reasonable conclusion that the magistrate could have drawn was that between the time that Crain became aware of the possibility of her arrest and the actual time of her arrest--which occurred in mid-April--Crain would have removed or destroyed all incriminating items in her residence. Consequently, Crain argues, probable cause did not exist when the warrant was issued in May. See United States v. Freeman, 685 F.2d 942, 951 (5th Cir.1982) (probable cause must coincide with issuance of warrant).
 
 
 45
 Although Crain's argument is not wholly without merit, it does not convince us that no probable cause existed when the warrant was issued. As an initial matter, we note that we must give "considerable deference" to the magistrate's determination of whether probable cause existed in May. Id. We simply cannot say that Crain's awareness in March that she might be arrested some time in the future dictated the conclusion that she would have removed or destroyed all the incriminating evidence in her home. Crain did not tell Koehler that Crain knew in fact that she would be arrested; she only expressed a fear that Stone would incriminate her. The magistrate could have reasonably assumed as late as May that Crain had not eradicated all traces of incriminating evidence from her home. Furthermore, the affidavit noted that one of the informants specifically stated that Crain had admitted that she did not remember where she had hidden some of her drug supply. In view of the drug-detection devices available to police, the magistrate still had probable cause for issuing the warrant even if he had reason to believe that Crain had attempted to destroy or remove all the drug-related evidence.
 
 
 46
 c. Evidentiary claims
 
 
 47
 Crain argues that the admission at trial of the self-titled methamphetamine formula seized during the search of her home is reversible error because Crain was not charged with manufacturing methamphetamine--that is, she argues the formula was evidence of Crain's manufacture of methamphetamine and thus was an "extrinsic offense" inadmissible under Rule 404(b) of the Federal Rules of Evidence. See United States v. Beechum, 582 F.2d 898, 911 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Crain also contends that the trial court erred in admitting Stone's testimony about Greenwood's admission that he and Crain had sold ten ounces of methamphetamine "in 1989" because the statement was hearsay.
 
 
 48
 With respect to the first claim, we initially note that Crain did not object to the admission of the formula at trial on this ground; she instead objected only on general "relevancy" grounds, which thus did not implicate Rule 404(b). Therefore, we may reverse only if the admission of the methamphetamine formula constitutes plain error, in view of Crain's failure to lodge a contemporaneous objection at trial. See Fed.R.Crim.Pro. 52(b). See United States v. Marrero, 904 F.2d 251 (5th Cir.) (404(b) claim reviewed for plain error when no specific objection at trial), cert. denied, --- U.S. ----, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990).[8] The Supreme Court has noted that Rule 52(b)authorizes the Court of Appeals to correct only "particularly egregious errors," those errors that "seriously affect that fairness, integrity or public reputation of judicial proceedings." In other words, the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."
 
 
 49
 United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted). Because we are firmly confident that the introduction of the formula was not plain error--indeed, if anything, was harmless error, see id. 52(a), in view of the overwhelming evidence of Crain's guilt of conspiracy to possess methamphetamine with the intent to distribute, see United States v. Freeman, 619 F.2d 1112, 1122 (5th Cir.1980), cert. denied, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981)--we see no need to address the merits of this particular claim.
 
 
 50
 With respect to the second claim, Crain claims that Greenwood's statement, as recounted by Stone, is highly prejudicial hearsay not within the co-conspirator exception under the Federal Rule of Evidence 801(d)(2)(E). At trial, although in an oblique manner, Crain objected on hearsay grounds--in arguing that because the conspiracy, according to the indictment, did not begin until May 1989, any incriminating statement made before May was obviously not made during the course of and in furtherance of the conspiracy. On appeal, however, Crain's hearsay theory has undergone a metamorphosis: Crain now argues that the statement was inadmissible hearsay, even if made after May 1, because Greenwood was not "furthering" the conspiracy by merely "bragging" about the amount of drugs that he and Crain had sold. See United States v. Lechuga, 888 F.2d 1472, 1480 (5th Cir.1989). Furthermore, it is argued, the statement was retrospective and may have referred to sales in 1989 that occurred before May 1. Because Crain did not object at trial on this specific hearsay ground, again we may only review on plain error grounds.
 
 
 51
 If this isolated portion of Stone's testimony were the only evidence linking Crain to the conspiracy, his complaint might be more serious if indeed the statement were inadmissible hearsay, which is questionable. However, as noted above, there was there a great deal of other evidence linking Crain to the methamphetamine conspiracy besides this particular testimony of Stone. Again, any error in this instance was not only not plain error, but likely harmless. See Fed.R.Crim.Pro. 52(b).
 
 3. Oliver
 
 52
 Oliver raises only one claim on appeal: whether there was constitutionally sufficient evidence to support his conviction of conspiracy to possess methamphetamine with the intent to distribute. As we noted, supra, our analysis here is also relevant to Crain's claim that there was a fatal variance between the indictment's allegations of a single conspiracy and the proof at trial, which allegedly showed two discrete conspiracies.
 
 
 53
 We hold that there was sufficient evidence to link Oliver to the Greenwood-Crain-Myers conspiracy. The principal evidence supporting this linkage was the testimony from Stone's wife and Johnston, Oliver's former girlfriend. The two witnesses testified that they were present at opposite ends of a long-distance telephone conversation during the Thanksgiving holiday in 1989 when Oliver and Crain arranged a methamphetamine transaction. There is sufficient evidence that Crain, Greenwood, and Oliver conspired together in this instance. Mrs. Stone heard Crain and Greenwood first discuss calling Oliver in order to arrange a methamphetamine transaction; specifically, she heard them indicate that they wished to acquire four ounces of methamphetamine. Mrs. Stone then heard Crain express her intent to call a residence "where Doyle [Oliver] was staying." Finally, Mrs. Stone further heard Crain ask the person at the other end of the line whether "everything was still set." Johnston testified that Oliver received a call at Johnston's residence during this precise period and that he discussed a drug transaction. Telephone company record show that a call charged to Crain's account was made from the Stones' residence, where Crain and Greenwood were visiting, to Johnston's residence during this same period. Johnson further testified that shortly thereafter she observed Crain and Greenwood, who had traveled to Oliver's town in Louisiana; Johnston claimed that Crain had asked Johnston where Crain could locate Oliver.
 
 
 54
 In order to be linked to the conspiracy, Oliver did not have to be specifically informed that Crain and Greenwood were planning to distribute the methamphetamine which they purchased. There was evidence that four ounces were exchanged, which according to expert testimony at trial readily qualifies as "dealer quantity." A jury could have, based on the totality of the evidence, rationally concluded that Oliver was a part of the Crain-Myers-Greenwood conspiracy.
 
 4. Myers
 
 55
 Myers likewise claims that there was constitutionally insufficient evidence to support Myers' conviction of conspiracy to possess methamphetamine with the intent to distribute. His principal argument is one that failed when made by Estrada and Ellis in the marijuana case: that Stone was an incredible witness as a matter of law. Myers adds that Stone had an additional reason to lie with respect to Myers: Stone had been dismissed from Myers' trucking company and thus harbored a motive to retaliate. For reasons noted above, such claim is meritless. Myers also makes a similar claim about Greenwood's former girlfriend, Koelher, whose testimony about Myers was highly incriminating. Myers points out that Koehler was a former prostitute and therefore cannot be believed. We disagree. These were quintessential issues of credibility, wholly within the province of the jury.
 
 
 56
 Myers also argues that even considering such testimony, a rational jury still could not find that Myers actually joined the conspiracy, as opposed to simply buying occasional methamphetamine from Greenwood or Crain. We disagree with Myer's version of the evidence. Stone testified in detail about a sale of $1300 worth of methamphetamine from Greenwood to Myers, noting that Myers explicitly stated his intention to pay Greenwood out of the cash proceeds from Myers' own sales of the drug. There was other, corroborating evidence as well. Mrs. Stone testified that Myers called the Stones' residence and asked to speak to Greenwood shortly after Greenwood had told Mrs. Stone that Myers expressed an intent to purchase methamphetamine. Stone also testified that Myers supplied his truckers with methamphetamine. Finally, Myers' name was listed in both Oliver and Crain's address books.
 
 
 57
 Accordingly, as was the case with the other co-conspirators, we affirm Myer's conviction.
 
 
 58
 C. The Government's methamphetamine cross-appeal
 
 
 59
 1. Do we possess jurisdiction?
 
 
 60
 The Government's cross-appeal of the district court's sentences in the methamphetamine case raises an array of exceedingly complex threshold jurisdictional questions. The four defendants/cross-appellees in the methamphetamines case[9] ("the cross-appellees") argue that we do not have jurisdiction over the Government's cross-appeal for a variety of reasons: i) because the Government's notices of cross-appeal were untimely under Federal Rule of Appellate Procedure 4(b); ii) because the cross-appellees' notices of appeal filed before the Government's motions for reconsideration of the sentences divested the district court of jurisdiction to hear the motions; and iii) because the district court had no authority under Rule 35(a) of the Federal Rules of Criminal Procedure to resentence the cross-appellees.
 
 
 61
 While the Government concedes that there was no statute or procedural rule authorizing its motions to correct the cross-appellees' sentences, the Government instead relies on two traditional common law procedural devices: i) that the Government's filing of what were in effect motions for reconsideration within the time in which a cross-appeal from the sentences was authorized under Rule 4(b) not only reinvested the district court with the jurisdiction that was otherwise lost when the cross-appellees filed their notices of appeal, but also postponed the operation of Rule 4(b) until the district court denied the motions; and ii) that the district court possessed an "inherent" authority, independent of any procedural rule or statute, to correct cross-appellees' illegal sentences.
 
 
 62
 We begin this discussion by setting forth a chronology of the relevant procedural events in the court below. On separate dates during the spring of 1991, the district court sentenced each of the cross-appellees to sixty months plus five years of supervised release from their respective methamphetamine conspiracy convictions. The four cross-appellees filed timely notices of appeal from their sentences pursuant to Federal Rule of Appellate Procedure 4(a). Within the period in which the Government was permitted under Federal Rules of Criminal Procedure 4(b) to file notices of cross-appeal from the sentences, the Government instead filed a "Motion for Resentencing" on the methamphetamine counts, arguing that the court had sentenced the cross-appellees as if methamphetamine was a schedule III controlled substance when in fact the drug is a schedule II controlled substance. On July 30, the district court formally entered its denial of the Government's motions for resentencing. On August 29, thirty days after the district court's order was entered, the Government filed a notice of appeal.[10]
 
 
 63
 a. Was the government's notice of appeal untimely?
 
 
 64
 i. The literal requirements of Rule 4(b)
 
 
 65
 Rule 4(b) of the Federal Rules of Appellate Procedure provides in pertinent part:
 
 
 66
 b. Appeals in Criminal Cases.
 
 
 67
 ... When an appeal by the government is authorized by statute, the notice of appeal shall be filed in the district court within 30 days after the entry of (i) the judgment or order appealed from or (ii) a notice of appeal by any defendant.
 
 
 68
 The cross-appellees argue that the Government's August 29th notice of appeal from the cross-appellees' methamphetamine sentences, filed more than thirty days after the district court's formal entries of judgment or the cross-appellees' respective notices of appeal, is untimely. Cross-appellees further argue that the Government's notice was untimely because the district court's order denying the Government's motions for reconsideration is not an "order" within the meaning of Rule 4(b), since no statute or rule authorized the filing such a motion or an appeal therefrom. Because the requirements of Rule 4(b) are both " 'mandatory and jurisdictional,' " Browder v. Director, Illinois Dept. of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 561, 54 L.Ed.2d 521 (1978) (citation omitted), the cross-appellees contend that we have no jurisdiction to hear the Government's cross-appeal.
 
 
 69
 ii. The Healy doctrine
 
 
 70
 The Government does not dispute that the literal requirements of Rule 4(b) were violated, but instead contends that there is a well-established common-law exception to Rule 4(b) that applied: a motion for reconsideration submitted to the district court tolled the period for filing a notice of appeal until the motion for reconsideration was denied by the district court. There are numerous Supreme Court cases containing this judicial gloss on Rule 4(b). See, e.g., United States v. Ibarra, --- U.S. ----, ---- - ----, 112 S.Ct. 4, 5-6, 116 L.Ed.2d 1 (1991); United States v. Dieter, 429 U.S. 6, 8, 97 S.Ct. 18, 19, 50 L.Ed.2d 8 (1976); United States v. Healy, 376 U.S. 75, 78-79, 84 S.Ct. 553, 555-56, 11 L.Ed.2d 527 (1964); see also United States v. Lewis, 921 F.2d 563, 564 (5th Cir.1991) (citing Healy ). Such cases have held that, despite the absence of a governing statute or procedural rule, a motion for reconsideration in a criminal case filed within the original period in which an appeal is permitted "render[s] the original judgment nonfinal for purposes of appeal for as long as the petition is pending." Dieter, 429 U.S. at 8, 97 S.Ct. at 19.[11] The Court noted this "well-established rule in civil cases" also applies in the criminal context. Healy, 376 U.S. at 78, 84 S.Ct. at 555. The Court was not concerned about the absence of language in a statute or procedural rule providing for this particular procedural device. Id. at 79-80, 84 S.Ct. at 556-57.
 
 
 71
 Furthermore, the Court has been quite permissive about what qualifies as a "motion for reconsideration"--i.e., any request, however phrased, that a district court " 'reconsider [a] question decided in the case' in order to effect an 'alteration of the rights adjudicated.' " Ibarra, --- U.S. at ----, 112 S.Ct. at 7 (citation omitted). Therefore, although submitted as a "Motion for Resentencing," the Government's post-trial motions qualified as a motion for reconsideration for purposes of Healy.
 
 
 72
 The rationale for this judicially-created exception to Rule 4(b)'s literal language is judicial economy. "[T]o deprive [a litigant] the opportunity to petition a lower court for correction of errors [in a motion for reconsideration] might ... actually prolong the process of litigation--since plenary consideration of a question of law [on appeal] ordinarily consumes more time than disposition of a petition for rehearing...." Healy, 376 U.S. at 80, 84 S.Ct. at 556.[12] And while the Court recognized that many petitions for reconsideration will be frivolous, "there is no certain way of deciding in advance which motions for reconsideration have the requisite degree of merit, and which do not. Given this, it is far better that all such motions be subsumed under one general rule--the rule laid down in Healy." Ibarra, --- U.S. at ----, 112 S.Ct. at 6. Thus, a "bright-line" jurisdictional doctrine exists, id., which was invoked by the Government in the instant case. We conclude that under the Healy doctrine the failure of the Government to file notices of appeal within thirty days from either the date that the district court formally entered the judgments in the methamphetamine case or the date from the cross-appellees' own notices of appeal does not prevent us from exercising jurisdiction over the cross-appeal.[13]
 
 
 73
 b. Other obstacles to invoking Healy?
 
 
 74
 Recognizing the applicability of the Healy doctrine does not end our inquiry. The cross-appellees have advanced two separate arguments which, they contend, preclude operation of the doctrine in the instant case. First, it is argued that the filing of the cross-appellees' respective notices of appeal before each of the Government's corresponding motions for reconsideration divested the district court of jurisdiction over the entire case, including jurisdiction over the Government's motions. See, e.g., Maresse v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985) ("In general, filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal."). Second, cross-appellees argue that the district court had no authority to correct its original sentence imposed on cross-appellees except under the narrow circumstances permitted by Rule 35(a) of the Rules of Criminal Procedure, which were not present in the instant case. We will address these two arguments in turn.
 
 
 75
 i. The divestiture doctrine
 
 
 76
 Cross-appellees' argument here is quite simple: the filing of a notice of appeal before the filing of a motion for reconsideration divests a district court of jurisdiction to rule on the motion, thus rendering Healy inapplicable. Although the Supreme Court has never addressed this technical question of timing in the criminal context, at least one other circuit has done so in a decision which cites analogous Supreme Court authority in the civil context. In United States v. Gargano, 826 F.2d 610 (7th Cir.1987) (Posner, J.), the Seventh Circuit was faced with a situation closely resembling the instant case. Pursuant to Rule 35 of the Federal Rules of Criminal Procedure, a federal prisoner sought a reduction of his sentence. The district court denied his motion on May 14. On the same day, the defendant filed a notice of appeal. On May 18, the defendant asked the district court to reconsider its denial of the Rule 35 motion. Id. at 611. The question for the court was whether the filing of the motion for reconsideration reinvested jurisdiction in the district court or whether the prior notice of appeal irrevocably vested jurisdiction in the court of appeals until the disposition of the appeal.
 
 
 77
 Citing Healy and Dieter, the Seventh Circuit concluded that the filing of the motion for reconsideration reinvested the trial court with jurisdiction to rule on the motion to reconsider the sentence. Id. at 611-12. The court held that it was immaterial that the motion to reconsider was filed after the notice of appeal. The court noted that under Rule 59 of the Federal Rules of Civil Procedure, which offers an analog in the civil context,[14] "the effect [of a motion to reconsider filed after a notice of appeal] would be to deprive the appellate court of jurisdiction; the appeal would be premature. But since the criminal rules are silent on motions for reconsideration, one is not surprised to find that the Federal Rules of Appellate Procedure make no express provision for the situation where a notice of appeal is filed in a criminal case before a timely motion to reconsider...." Id. at 612. The court stated that "what is required is some judicious judicial interpolating." Id.
 
 
 78
 The court concluded that caselaw interpreting Federal Rule of Civil Procedure 59 provided an apt analogy. Even though that Rule does not directly address the effect of filing of a notice of appeal before filing a Rule 59 motion, a Rule 59 motion has been held by the Supreme Court to "nullif[y] any notice of appeal filed before" a such a motion is filed. Id. at 611 (citing Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982) (per curiam)).[15] In Griggs, the Court summed up the "effect of a Rule 59 motion on a previously filed notice of appeal": " 'The appeal simply self-destructs.' " Id. at 61, 103 S.Ct. at 403 (citing 9 Moore's Federal Practice p 204.12, at 4-65 n. 17). Thus, the Seventh Circuit concluded, "a motion to reconsider should knock out the appeal, just as in the civil ... setting[ ]. It would be a waste of everyone's time for this court to be considering an appeal that might soon be mooted by the district court's action on a motion to reconsider...." Gargano, 826 F.2d at 612.
 
 
 79
 Like the Seventh Circuit, we think that the combination of the common law Healy doctrine and Griggs ' analogous reasoning with respect to civil Rule 59 suggests that the cross-appellees' notices of appeal did not divest the district court of the jurisdiction to rule on the Government's motions for reconsideration filed shortly thereafter.[16] This pragmatic approach to the question of which court, district or appellate, possessed jurisdiction--rejecting the traditional notion of mutual exclusivity of jurisdiction--finds support in a number of cases decided by this Court.
 
 
 80
 In United States v. Ortega, 859 F.2d 327, 335 (5th Cir.1988), we reassessed our prior cases following the traditional doctrine that a notice of appeal irrevocably divests a district court of jurisdiction, see, e.g., United States v. Garrett, 583 F.2d 1381, 1391 (5th Cir.1978) (district court could not correct sentence once a notice of appeal was filed), and eschewed a strict application of the divestiture rule. We noted that two en banc decisions of this Circuit rendered after cases such as Garrett had likewise "recognized that rigid application of the divesture of jurisdiction rule is not desirable." Id. at 334, citing United States v. Dunbar, 611 F.2d 985 (5th Cir.) (en banc), cert. denied, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); United States v. Hitchmon, 602 F.2d 689 (5th Cir.1979) (en banc).
 
 
 81
 In the instant case, we refuse to hold that Healy and its strong pragmatic underpinnings are inapposite simply because the cross-appellees filed their notices of appeal shortly before the Government moved the district court to reconsider the sentences. As the Government argues in its brief, if the cross-appellees' arguments were to become established procedure, "there would be a race by the parties in each case from the courtroom to the clerk's office to see who, by filing [a notice of appeal] first, could deprive the other of the right to ... request reconsideration."
 
 
 82
 For this reason we do not follow the Eleventh Circuit's holding in United States v. Rogers, 788 F.2d 1472 (11th Cir.1986), upon which cross-appellees rely with respect to this issue. In Rogers, the criminal defendant filed a timely notice of appeal. Thereafter, within the thirty day period during which a cross-appeal could be filed under Federal Rule of Appellate Procedure 4(b), the Government instead filed a motion for reconsideration in the district court. The Eleventh Circuit refused to hold that the filing of the motion stopped Rule 4(b)'s thirty-day clock from running until the district court denied the motion for rehearing. Because the Government had given notice of its cross-appeal more than thirty days after the defendant's notice of appeal, the Eleventh Circuit held that the cross-appeal was untimely and that the appellate court had no jurisdiction. See id. at 1475. We note that the Rogers court, in reaching its decision that "[t]he filing of the notice of appeal ... divest[ed] the district court of jurisdiction" to rule on the motion for reconsideration, id., never cited Healy or any of its progeny.
 
 
 83
 Contrary to Rogers, we hold that the Rule 4(b) of the Federal Rules of Appellate Procedure was not activated with respect to the Government's right to cross-appeal until the district court denied the Government's motion to reconsider. The Government thus filed its notice of cross-appeal within the thirty-day period required by Rule 4(b).
 
 
 84
 ii. Rule 35(a) and the authority of a trial court to correct
 
 
 85
 sentencing errors prior to remand after appeal
 
 
 86
 Even though we hold that cross-appellees' notices of appeal did not divest the district court of jurisdiction, we still must determine whether the district court possessed any authority to correct cross-appellees' sentences, assuming that they were illegally imposed as the Government claims. The cross-appellees contend that the relevant provision of the Federal Rules of Criminal Procedure, Rule 35(a), as it stood prior to its 1991 amendment, did not confer authority on a district court to correct an illegal sentence, save upon remand from a circuit court.[17] In short, the cross-appellees argue, the Healy doctrine is inapplicable because the court below had no legal authority to rule on the Government's motions to reconsider the sentences. We note that the issue of whether a district court possesses a non-statutory or "inherent" authority to correct an illegal sentence has been the subject of numerous recent appellate decisions in the various circuits.[18] This circuit has never squarely addressed this issue, although we discussed a similar, but distinguishable, issue in another case.[19]
 
 
 87
 We do not believe, however, that we need to reach this issue here. Rather, we adopt the approach of the First Circuit in United States v. Carr, 932 F.2d 67 (1st Cir.1991), a case which resembles the instant case. In Carr, the Government filed a motion to reconsider the defendants' sentences within the original period that the Government was permitted to file a notice of cross-appeal; however, the Government failed to file a notice of cross-appeal within that time. Instead, notice was filed only after the district court denied the motion for reconsideration, which was also well after the original thirty-day period under Federal Rule of Appellate Procedure 4(b) had lapsed. The First Circuit held that it had jurisdiction over the Government's appeal. See id. at 71.
 
 
 88
 Rather than holding that the district court had an "inherent" power to correct an illegal sentence, the Carr court focused instead on the rationale in Healy and Dieter:[T]he Dieter court relied upon what it called the "traditionally and virtually unquestioned practice" of treating rehearing petitions as suspending the limitation period, refusing to consider a statute or rule.... The Dieter Court also emphasized the practical desirability of unburdening appellate courts by allowing the district courts to correct their own alleged errors.... If the Court is to be taken literally--and when all nine members of the Supreme Court speak, we are certainly not disposed to do otherwise--we think that the traditional tolling must continue to be observed [in the context of sentencing].... The precise question is not the extent of the district court's corrective powers [to resentence] but simply whether the rule in Dieter was repealed sub silento [in the context of motions to reconsider sentences] by ... Rule 35.... Until the Supreme Court, Congress or the bodies collectively responsible for adopting the Federal Criminal Rules send a clearer signal that Dieter is not still the law, we believe it incumbent on us to follow it.
 
 Id. at 71 (emphasis added).[20]
 
 89
 The Carr court held that "we need take no position on the extent of the district court's retained corrective powers, if any. It is enough for present purposes that the government's reconsideration motion cannot under today's case law, be said to have been unquestionably and blatantly outside the district court's jurisdiction to resolve." Id. at 72. We agree. Accordingly, we simply apply the Healy doctrine, which we hold was activated by the Government's filing of its motion for reconsideration of the district court's sentences in the methamphetamine case. The Government's August 29, 1991 notice of appeal was thus filed in a timely manner.
 
 
 90
 2. The merits of the Government's cross-appeal
 
 
 91
 a. Did the district court rely on an incorrect statute in
 
 
 92
 imposing the methamphetamine sentences?
 
 
 93
 Although the Government correctly cited 21 U.S.C. §§ 846[21] & 841(a)(1)[22] in the methamphetamine indictment as the relevant criminal statutes, the Government referred to methamphetamine as a "schedule III" controlled substance. At sentencing, the Government argued that the cross-appellees should be sentenced for possession with intent to distribute a schedule II controlled substance since methamphetamine is properly classified as schedule II rather than schedule III controlled substance.[23] The trial court rejected the Government's argument, stating that "the Government is stuck with its indictment," and sentenced the cross-appellees as if methamphetamine were a schedule III controlled substance.
 
 
 94
 We agree with the Government that the sixty-month sentences were based an erroneous classification of methamphetamine as a schedule III, rather than schedule II, substance. Since the early 1970s, as a matter of law, methamphetamine has been classified as a schedule II controlled substance. See e.g., United States v. Roark, 924 F.2d 1426, 1428 (8th Cir.1991) (citing 21 C.F.R. § 1308.12(d)); United States v. Wilhoit, 920 F.2d 9, 10 (9th Cir.1990); United States v. Schrock, 855 F.2d 327, 331-32 (6th Cir.1988); cf. United States v. Daniel, 813 F.2d 661, 662-64 (5th Cir.1987) (amphetamine a schedule II controlled substance). The district court, therefore, erroneously applied 21 U.S.C. § 841(b)(1)(D), which provides that "[i]n the case of ... any controlled substance in schedule III, such person shall ... be sentenced to a term of imprisonment of not more than 5 years...." Conversely, 21 U.S.C. §§ 841(b)(1)(A)(viii) and (b)(1)(B)(viii), which the district court refused to apply, expressly provide that a defendant possessing methamphetamine with the intent to distribute may be sentenced to a term of imprisonment considerably harsher than five years.[24] And according to the Sentencing Guidelines, as noted by the probation officer in the cross-appellees' pre-sentence investigation reports, possession of the amount of methamphetamine involved in the instant case should result in a sentence of at least 121 months, depending on an individual defendant's criminal history category. See U.S.S.G. § 2D1.1(c) (base offense level of 32). Because the court applied the wrong statute and ignored the Guidelines' recommendation, the sentences it imposed were illegal. Under 18 U.S.C. § 3742(b)(2), we are authorized to remand for resentencing.
 
 
 95
 b. The significance of the reference in the indictment to
 
 
 96
 methamphetamine as a schedule III controlled substance
 
 
 97
 The district court's refusal to correct the sentences, as noted, was based on the court's belief that the reference to methamphetamine as a schedule III substance in the indictment dictated the court's hand at sentencing. We disagree. It is well established that even the citation of an inapposite criminal statute in an indictment does not render a conviction based on a different statute invalid, so long as the elements of the relevant statutory offense charged are adequately described in the indictment. See, e.g., Williams v. United States, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897). As the Court held in Williams:
 
 
 98
 It is wholly immaterial what statute was in the mind of the District Attorney when he drew the indictment, if the charges made are embraced by some statute in force.... We must look at the indictment itself, and if it properly charges an offense under the laws of the United States, that is sufficient to sustain it, although the representative of the United States may have supposed that the offense was covered by a different statute.
 
 
 99
 Id. at 389, 18 S.Ct. at 94; see also United States v. Bonallo, 858 F.2d 1427, 1430 (9th Cir.1988) ("the description of the alleged conduct is far more critical than the indictment's ... citation of a particular provision of a statute."). The Federal Rules of Criminal Procedure have codified this principle of law. See Fed.R.Crim.Pro. 7(c)(3) ("Error in citation of omission shall not be ground ... for reversal of a conviction if the error did not mislead the defendant to the defendant's prejudice."); cf. United States v. Kaiser, 599 F.2d 942, 943 (10th Cir.1979) ("Describing amphetamine as a Schedule III controlled substance [in the indictment], when actually it is a Schedule II controlled substance, is a type of 'error' contemplated by Rule 7(c)(3).").
 
 
 100
 In the instant case, it is undisputed that the indictment not only cited the applicable provisions of the relevant criminal statute, 21 U.S.C. §§ 841 & 846, but also that the Government explicitly referred to "methamphetamine." The Government merely mischaracterized what schedule of controlled substance that methamphetamine fell under.[25] Because the schedule of controlled substances is an administrative classification, rather than a legislative matter, see Roark, 924 F.2d at 1428 (citing 21 C.F.R. § 1308.12(d)), William 's reasoning applies a fortiori. None of the cross-appellees were prejudiced by the misclassification.[26] Therefore we hold that the district court erred in holding that the Government was "stuck with" the indictment's misclassification of methamphetamine.
 
 
 101
 c. Double jeopardy
 
 
 102
 Finally, cross-appellees contend that remanding the methamphetamine cases for sentencing corrections would constitute double jeopardy. Again, we disagree. Crain correctly cites the leading case on double jeopardy in the context of resentencing, United States v. DiFrancesco, 449 U.S. 117, 132-33, 101 S.Ct. 426, 434-35, 66 L.Ed.2d 328 (1980), in which the Court held that double jeopardy does not prevent appellate review of a Government's statutorily authorized appeal of a defendant's sentence just because the Government's success might increase the original sentence on remand. The Court noted that a criminal sentence does not possess the same type of finality traditionally associated with an acquittal. Id. at 134-35, 101 S.Ct. at 435-36. Cross-appellees also cite a line of post-DiFrancesco lower court cases in which courts have held that "[c]onsitent with [DiFrancesco 's] rationale, the circuits have generally concluded that the key to double jeopardy analysis of a sentence increase is whether the defendant had a legitimate expectation in the finality of his original sentence." Stewart v. Scully, 925 F.2d 58, 63 (2d Cir.1991) (collecting cases); see also United States v. Crawford, 769 F.2d 253, 257 (5th Cir.), cert. denied, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1985).
 
 
 103
 Cross-appellees argue that they indeed had a legitimate expectation in the finality of the original sixty-month sentences. They claim that because the Government did not formally appeal from the sentences, but instead filed motions for reconsideration in the district court and appealed the denials therefrom, cross-appellees believed that their sentences, whether illegal or not, were "final." This argument, although quite creative, is based on flawed assumptions that we rejected above. Cross-appellees erroneously argue that the Government's motion for reconsideration was an "improper" procedural device, which could not have been reasonably expected by cross-appellees; likewise, they argue that an appeal from a denial of such a motion was also not proper and, thus, cross-appellees' expectations of the finality of their sentences should be respected. As we held above, cross-appellees have simply ignored the Healy doctrine. The Government's motion for reconsideration of the sentences was perfectly proper and deferred the operation of Federal Rule of Appellate Procedure 4(b) until that motion was denied. Furthermore, although the Government technically appealed the district court's denial of the resentencing motions, we also held above that the Government's notices of appeal of their denial was tantamount to a notice of appeal from the cross-appellees' sentences. Thus, DiFrancesco controls, and we hold that there will be no double jeopardy bar to the district court's correction of the illegal sentences in the methamphetamine case.
 
 III. CONCLUSION
 
 104
 For the foregoing reasons, we AFFIRM all appellants' convictions in both the marijuana case (No. EP-90-CR-82-H-A) and the methamphetamine case (No. EP-90-CR-82-H-B). Under 18 U.S.C. § 3742(b)(2), we VACATE the appellants' sentences in the methamphetamine case (No. EP-90-CR-82-H-B) and remand it to the district court to resentence in a manner not inconsistent with this opinion.
 
 
 
 *
 Circuit Judge of the Second Circuit, sitting by designation
 
 
 [1]
 Greenwood was convicted of: i) conspiracy to import marijuana, for which he received a sentence of 120 months imprisonment and four years of supervised release; ii) conspiracy to possess with the intent to distribute marijuana, for which he received a sentence of 120 months imprisonment and four years of supervised release; iii) importation of marijuana, for which he received a sentence of 60 months imprisonment and three years of supervised release; iv) possession with the intent to distribute marijuana, for which he received a sentence of 60 months and three years of supervised release; and v) three counts of intimidation of a witness, for which he received 120 months imprisonment and three years of supervised release on each count. Greenwood only appeals from his convictions for witness intimidation
 Ellis was convicted of conspiracy to possess with the intent to distribute marijuana, for which he received 63 months imprisonment and four years of supervised release. He appeals from that conviction.
 Estrada was convicted of: i) conspiracy to import marijuana, for which he received 63 months imprisonment and four years of supervised release; ii) conspiracy to possess with the intent to distribute marijuana, for which he received 63 months imprisonment and four years of supervised release; iii) importation of marijuana, for which he received 60 months imprisonment and four years of supervised release; iv) possession of marijuana, for which he received 60 months imprisonment and four years of supervised release. He appeals from those four convictions.
 Crain was convicted of conspiracy to import marijuana and conspiracy to possess marijuana, for which she received two sentences for 78 months imprisonment and five years of supervised release. She appeals from those two convictions.
 
 
 [2]
 All four co-defendants were convicted of conspiracy to possess with the intent to distribute methamphetamine, for which each was sentenced to 60 months of imprisonment and five years of supervised release. Each appeals from his or her respective conviction
 
 
 [3]
 An expert witness testified that an ounce of methamphetamine qualifies as "dealer" quantity, as opposed to "user" quantity
 
 
 [4]
 Marijuana defendant Greenwood does not appeal his four marijuana-related convictions. He does appeal his convictions of intimidating a witness, which occurred at the marijuana trial rather than the methamphetamine trial; however, for the sake of convenience, that claim will be discussed together with Greenwood's appeal in the methamphetamine case, addressed in Part II.B.1.a., infra. Marijuana defendant Crain does not appeal her two marijuana-related convictions except insofar as she generally challenges the constitutionality of a search of her home that revealed evidence that was offered at both trials. For the sake of convenience, the Fourth Amendment claim will be addressed in the discussion of Crain's methamphetamine appeal in Part II.B.2.b., infra
 
 
 [5]
 Technically, this is a separate claim, as distinguished from a sufficiency-of-the-evidence claim. Because of its obvious relation to Estrada's challenge to the sufficiency of evidence supporting the conspiracy, we will address it here
 
 
 [6]
 We note that in sentencing Ellis, the district court took into consideration his minor role
 
 
 [7]
 The term "official proceedings" is defined as to include, inter alia, proceedings before a judge or court of the United States, a United States magistrate, or a federal grand jury. 18 U.S.C. § 1515(a)(1)
 
 
 [8]
 We note that under the leading 404(b) case in this Circuit, United States v. Beechum, supra, a district court when faced with a defendant's objection on Rule 404(b) grounds, is required to conduct a two-part inquiry outside of the presence of the jury regarding (i) whether the alleged extrinsic offense is relevant to one or more of the "other purposes" under Rule 404(b), and (ii) whether the proffered evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice," i.e., a standard Rule 403 analysis. See id. at 911
 A defendant must object on Rule 404(b) grounds in order to require a district court to conduct a Beechum hearing. Crain errs in arguing that, irrespective of a defendant's failure to object in a timely fashion at trial, Beechum is activated when a Rule 404(b) issue is "close" and that a district court must engage in a Beechum analysis sua sponte. Crain misinterprets our cases. We have held that if a timely Rule 404(b) objection is made and a Beechum hearing is held, the district court must sua sponte articulate its findings on the record if the Rule 404(b) issue is a close call. See, e.g., United States v. Fortenberry, 860 F.2d 628, 634 n. 11 (5th Cir.1988). Yet the defendant must first object on Rule 404(b) grounds before a trial court is required to conduct any Beechum analysis. As noted, Crain did not object on Rule 404(b) grounds at trial.
 
 
 [9]
 Crain, Greenwood, Oliver, and Myers
 
 
 [10]
 
 SUMMARY OF PROCEDURAL EVENTS
 April 22: district court entered judgment, including sentence, for Greenwood's methamphetamine conviction.
 April 25: Greenwood files a notice of appeal from his methamphetamine conviction.
 April 26: district court sentences Crain for methamphetamine conviction; judgment formally entered May 6.
 May 1: Crain files a notice of appeal from her methamphetamine conviction.
 May 7: district court entered judgment, including sentence, for Oliver's methamphetamine conviction;
 Oliver files a notice of appeal from his methamphetamine conviction.
 May 10: Government files a three "Motions for Resentencing" in the district court, requesting reconsideration of Greenwood, Crain, and Oliver's sentences.
 May 15: district court entered judgment, including sentence, for Myers' methamphetamine conviction;
 Myers files a notice of appeal from his methamphetamine conviction;
 Government files a "Motion for Resentencing" in the district court, requesting reconsideration of Myers' sentence.
 July 30: district court denies Government's Motions for Reconsideration of all four defendants' sentences.
 August 29: Government files a notice of appeal from the denial of the Motions for Resentencing.
 
 
 [11]
 It is not precise to say, as the Government does, that filing a motion for rehearing "tolls" the time to file a notice of appeal. Rather, although Federal Rule of Appellate Procedure 4(b) requires the Government to file a notice of appeal "within 30 days after the entry of (i) the judgment or order appealed from or (ii) a notice of appeal by any defendant," filing a motion for reconsideration actually starts Rule 4(b)'s 30-day clock ticking anew after the district court denies the motion. See Ibarra, --- U.S. at ---- n. 2, 112 S.Ct. at 5 n. 2 ("would-be appellants [who initially file a motion for reconsideration] are entitled to the full 30 days after the motion to reconsider has been decided")
 
 
 [12]
 Although Healy itself only concerned Supreme Court practice--whether the Court had jurisdiction from appeals directly from district courts when a motion for reconsideration was interposed during the normal appeals period--Dieter extended the rule to appeals to circuit courts. See Dieter, 429 U.S. at 8, 97 S.Ct. at 19 ("The fact that appeals are now routed to the courts of appeals does not affect the wisdom of giving district courts the opportunity to correct their own alleged errors....")
 
 
 [13]
 The cross-appellees also argue that because there is no formal provision in a statute that authorizes an appeal from a district court order denying a motion for reconsideration, the Government's cross-appeal is not properly before this Court. Although we agree with the general rule that the Government's right to appeal in a criminal case must come from express congressional authorization, see United States v. Hitchmon, 602 F.2d 689, 692 (5th Cir.1979) (en banc), we do not believe that under the circumstances of the present case the Government is pursuing an extra-statutory appeal. Although in form the Government's notice of appeal was from the district court's July 30th denial of the motion to reconsider, in substance the appeal is one from the district court's sentences imposed in the spring of 1991. Numerous courts have held that so long as a notice of appeal puts the other side on notice that the final judgment is the subject of the appeal, a technical defect in the notice of appeal is not fatal. See, e.g., Matute v. Procoast Nav. Ltd., 928 F.2d 627 (3d Cir.1991) (appealing from denial of motion to reconsider order of dismissal sufficient to appeal dismissal); see also 9 Moore's Federal Practice p 203.18 at 3-76-77 ("as long as intent to appeal from a specific judgment can be fairly inferred from notice and the appellee is not misled by the mistake," misstatement in notice of appeal non-fatal to appellate court's jurisdiction)
 
 
 [14]
 Rule 59(a) & (e) provide, respectively, for motions for a new trial and motions to alter or amend judgments. Although not explicit in the Rule, it is common practice to refer to Rule 59 motions as "motions for reconsideration" or "motions for rehearing." See generally Annotation, Motion or petition for rehearing in court below as affecting time within which appellate proceedings must be taken or instituted, 10 A.L.R.2d 1075, §§ 4, 6
 
 
 [15]
 This Circuit has adhered to the same approach with respect to the effect in a civil case of a Rule 59 motion on a previously filed notice of appeal. See Harcon Barge Co. v. D. & G. Boat Rentals, Inc., 784 F.2d 665 (5th Cir.1986) (en banc)
 
 
 [16]
 We note briefly that our application of the Healy doctrine, or at least our agreement with the Seventh Circuit's approach in Gargano, raises yet another jurisdictional twist to this case, one that was not raised by the parties. A strict application of the principle that a notice of appeal "self-destructs" when a subsequent motion for reconsideration is filed, see Gargano, 826 F.2d at 611 (citing Griggs v. Provident Consumer Discount Co., 459 U.S. at 61, 103 S.Ct. at 403), would require us to hold that the cross-appellees' notices of appeals became legal nullities when the Government filed its corresponding motions for reconsideration. Because the cross-appellees did not file new notices of appeal within ten days thereafter, see Fed.R.App.Pro. 4(a) (criminal defendant afforded ten days to appeal), according to Gargano we are without jurisdiction
 This is not the first case in addition to Gargano in which this precise issue has arisen. At least five circuits besides the Seventh have grappled with this difficult jurisdictional question. See United States v. Davis, 924 F.2d 501 (3d Cir.1991) (adopting Seventh Circuit approach); United States v. Jones, 669 F.2d 559, 561 (8th Cir.1982) (adopting modified Seventh Circuit approach); but see United States v. Garrison, 963 F.2d 1462, 1465 (11th Cir.1992) (notice of appeal filed before district court rules on pending motion for reconsideration simply held in abeyance until district rules on motion); United States v. Varah, 952 F.2d 1181, 1183 (10th Cir.1991) (same); United States v. Cortes, 895 F.2d 1245, 1247 (9th Cir.) (same), cert. denied, 495 U.S. 939, 110 S.Ct. 2191, 109 L.Ed.2d 519 (1990).
 Unlike the Seventh and Third Circuits, we do not agree that in a criminal case a notice of appeal forever self-destructs if a motion for reconsideration is subsequently filed. A new notice of appeal need not thereafter be filed within the time originally provided by Federal Rule of Appellate Procedure 4(b). Rather, we agree with the Ninth, Tenth, and Eleventh Circuits, which have held that the original notice of appeal simply lies dormant while the district court rules on a motion for reconsideration. Once the district court disposes of that motion, the notice of appeal is reactivated.
 Strictly applying Griggs ' gloss on Federal Rule of Appellate Procedure 4(a) to the criminal context is not preferable. We note that Rule 4(a)(4), which governs civil appeals, contains express language that states that "[a] notice of appeal filed before the disposition of any [Rule 59 motion] shall have no effect." Although Griggs took this rule one step farther by holding that a notice of appeal filed before a civil motion for reconsideration self-destructs upon the filing of the subsequent motion, civil litigants were given some warning to that effect by the express language of the rule. The same cannot be said, however, in the criminal context. Rule 4(b), which governs criminal appeals, contains no equivalent language to that in Rule 4(a). We agree with the Eleventh Circuit that to take the Seventh and Third Circuit's position would have draconian results and "would prove to be a trap for the unwary [criminal defendant]" who files a timely notice of appeal, which unexpectedly could be rendered null and void by a subsequent filing by the Government of a motion for reconsideration. United States v. Garrison, 963 F.2d 1462, 1465 (11th Cir.1992). Such a result would certainly be unexpected in this case. Indeed, the Government was even unaware of this jurisdictional issue.
 Thus, although we accept the Gargano court's holding that a district court has jurisdiction to rule on a motion for reconsideration in a criminal case filed after a notice of appeal has been filed, we do not agree that the prior notice of appeal simply "self-destructs." Rather, the first notice of appeal is held "in abeyance until the disposition of all motions [for reconsideration] in the district court." Garrison, 963 F.2d at 1465-66. Accordingly, we have jurisdiction over all the parties' appeals in this case.
 
 
 [17]
 Rule 35(a), as it read prior to 1991, provided that:
 (a) Correction of a Sentence on Remand. The court shall correct a sentence that is determined on appeal under 18 U.S.C. 3742 to have been imposed in violation of law, to have been imposed as a result of an incorrect application of the sentencing guidelines, or to be unreasonable, upon remand of the case to the court....
 The original version of that provision, in effect from 1946-1987, stated that a trial court "may correct an illegal sentence at any time " (emphasis added). Rule 35 was amended again, effective December 1, 1991, so as to allow a trial court to correct arithmetical, technical, or "clear" errors in sentencing, but permits a district court to do so only within seven days after the original sentence was imposed, rather than "at any time."
 
 
 [18]
 See United States v. Himsel, 951 F.2d 144 (7th Cir.1991); United States v. Strozier, 940 F.2d 985 (6th Cir.1991); United States v. Smith, 929 F.2d 1453 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991); United States v. Rico, 902 F.2d 1065 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990); United States v. Cook, 890 F.2d 672 (4th Cir.1989); see also United States v. Betancur, 972 F.2d 1343 (9th Cir.1992) (unpublished, citing Cook and Rico with approval)
 These decisions have held that a district court has an "inherent" authority to correct certain fundamental errors in sentencing--notwithstanding the "remand" language in Rule 35(a), as it stood between 1987-1991, which would appear to preclude a district court from resentencing a defendant except on remand from a court of appeals. But see United States v. Minor, 846 F.2d 1184, 1187 (9th Cir.1988).
 
 
 [19]
 See United States v. Henry, 709 F.2d 298 (5th Cir.1983) (en banc) (plurality). Henry involved the question of whether a district court had the "inherent" authority to resentence if the original sentence was legal--a power never explicitly conferred by Rule 35. The plurality held that a district court possessed no such "inherent" authority. See id. at 307-09. Henry is thus distinguishable from the many recent decisions from the other circuits in that the issue in those cases was whether a district court had the power to correct an illegal sentence. See, e.g., Himsel, 951 F.2d at 146-47
 
 
 [20]
 Shortly after the First Circuit decided Carr, the Supreme Court unanimously reaffirmed Healy and Dieter in United States v. Ibarra, --- U.S. ----, ---- - ----, 112 S.Ct. 4, 4-7, 116 L.Ed.2d 1 (1991)
 
 
 [21]
 That provision provides: "Any person who ... conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the ... conspiracy."
 
 
 [22]
 That provision provides: "[I]t shall be unlawful for any person knowingly or intentionally ... to ... possess with the intent ... to distribute[ ] a controlled substance...."
 
 
 [23]
 We note that, despite the cross-appellees' arguments to the contrary, the Government has not waived its right to cross-appeal all of the methamphetamine sentences. At the first methamphetamine co-defendant's sentencing hearing, the Government objected, although to no avail, to the sixty-month sentence. At the second co-defendant's sentencing hearing, the district court stated that "I already ruled on that once in the case of a co-defendant.... And so I'm not going to change my ruling in this case." Any further objection by the Government would have been futile; therefore, the Government was not required to re-object for each co-defendant since an identical issue was raised with respect to each methamphetamine co-defendant's sentence. Cf. Douglas v. Alabama, 380 U.S. 415, 421-23, 85 S.Ct. 1074, 1078, 13 L.Ed.2d 934 (1965) (repeated objections regarding same issue not required to preserve error for federal appellate review once trial court denies initial objection). A main rationale of the contemporaneous objection rule is to permit the trial court to have the initial opportunity to rule on an objection. See United States v. Gwaltney, 790 F.2d 1378, 1386 (9th Cir.1986). In this case, the trial court twice squarely refused to impose a sentence of more than sixty months.24 Subsection (1)(A)(viii) applies to possession of "100 grams or more" of methamphetamine and provides for "a term of imprisonment which may not be less than 10 years or more than life"; subsection (1)(B)(viii) applies to possession of "10 grams or more of methamphetamine" and provides for "a term of imprisonment which may not be less than 5 years and not more than 40 years."
 
 
 [25]
 We note that the misclassification occurred only in the Government's superseding indictment. In the original methamphetamine indictment, the Government correctly classified the drug as schedule II
 
 
 [26]
 Cross-appellee Crain argues that she will be prejudiced if we remand in order for the district court to correct its sentence because Crain's strategy below was based on the assumption that she would be sentenced for a schedule III controlled substance rather than a schedule II controlled substance. We cannot accept this argument. Crain was on fair notice that methamphetamine was a schedule II controlled substance and that her conviction for the possession with the intent to distribute could result in a sentence in excess of five years. The Government's first methamphetamine indictment correctly listed the drug as schedule II. Furthermore, the penalty provisions of the statute cited in the superseding indictment, 21 U.S.C. §§ 841(b)(1)(A)(viii) and 841(b)(1)(B)(viii), expressly permit penalties for methamphetamine offenses far in excess of five years