# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-31007

UNITED STATES OF AMERICA,

     Plaintiff - Appellee

v.

CORNELL PENDLETON,

     Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

February 21, 2019

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CR-41-1

Before SMITH, BARKSDALE, and HO, Circuit Judges.

PER CURIAM:*

     Cornell Pendleton contests his conviction and sentence for conspiracy, money laundering, structuring, and making a false statement on a loan application. Convicted on eight counts and acquitted on seven, Pendleton claims: there was insufficient evidence from which a jury could have convicted him; and the court erred in failing to strike a juror, correcting a jury instruction during jury deliberation, and calculating his advisory Sentencing Guidelines

---

     * Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 17-31007

sentencing range.  The Government notes a variance between the oral and written pronouncements of Pendleton's sentence.  AFFIRMED.

## I.

Operating in New Orleans, Pendleton purchased properties and vehicles and made personal loans for those without enough credit to obtain traditional financing.  In 2010, he met Sorina at a barbershop owned and frequented by drug dealers, including Hardy, Smith, Butler, and Sanders.  The barbershop's owner and customers frequently spoke openly about drugs and money, including in Pendleton's presence.  He was heard on a number of occasions during these conversations to laugh and say "I don't know nothing".

Sorina had been released from prison in 2009, where he had been incarcerated on drug charges.  Following his release, he worked on occasion at Boh Brothers Construction, before starting his own concrete business.  Nevertheless, Sorina began selling marihuana in 2012; later that year, heroin.  Also that year, Pendleton began buying assets for Sorina, beginning with a 2012 Mercedes Benz.

During the period 2012-2014, Sorina paid Pendleton—all in cash drug proceeds—$81,000 for the Mercedes; $21,000 and $7,000, respectively, for two Rolexes; $150,000 for two apartment complexes in New Orleans, on Hayne Boulevard and St. Ferdinand Street, respectively, plus approximately $97,000 to remodel both complexes; $90,000 for a 2013 Porsche Cayenne; at least $120,000 for a house on Santa Cruz Court in Slidell; approximately $30,000 for a house on North Cavalier in New Orleans; and $25,000 for a 2014 Chevrolet Corvette.  After purchasing the items, Pendleton would either keep them in his name or transfer ownership to someone connected with Sorina, such as his wife or mother.  Pendleton received large fees in return.

Pendleton also bought assets for some of Sorina's mid-level dealers.  Hardy paid Pendleton $32,000-$37,000 for a 2007 BMW, which remained registered in Pendleton's name; and  Butler paid Pendleton at least $65,000 for a 2014

2

No. 17-31007

Mercedes CLS 63, which remained registered in Pendleton's name, but used Sorina's address at 109 Santa Cruz. Sanders paid Pendleton at least $55,000 for a 2005 Bentley Continental. Pendleton also met with two of Sorina's mid-level dealers, Smith and Alexander, about deals which ultimately failed.

A law-enforcement investigation into Sorina's drug organization, which included an approximate five-month wiretap on his telephone beginning in March 2014, led to Pendleton. He was indicted on 15 counts: conspiracy to distribute drugs, conspiracy to commit money laundering, money-laundering (ten counts), structuring, and making a false statement on loan applications (two counts).

Over the course of four days, the Government presented its case-in-chief, which included testimony from: three DEA agents involved in the investigation of Sorina and Pendleton; a financial analyst for the Department of Justice's Organized Crime Drug Enforcement Task Force; drug dealers Sorina, Hardy, Smith, and Alexander; Pendleton's accountant; two employees of the Chevrolet dealership where Pendleton bought Sorina's Corvette; and a partner in the law firm at which Pendleton stated—on the loan application for the Corvette—he was employed as a manager.

After the Government had presented its case-in-chief, the court was informed one juror had made a prejudicial comment about Pendleton. The court interviewed the jurors individually to determine the scope of the comment, and determined: one offhand comment had been made; no premature deliberations had occurred; and all jurors could be fair and impartial. The court, therefore, refused to disqualify any juror or declare a mistrial.

In addition, after the Government's case-in-chief, Pendleton moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a), challenging the sufficiency of the evidence on all 15 counts; the court deferred ruling on counts 3, 5, 9, and 14, and denied the motion for the other counts.

Pendleton, who elected pursuant to the Fifth Amendment not to testify, called as witnesses his insurance agent and six people he assisted with financing.

3

No. 17-31007

They testified, *inter alia*: Pendleton financed vehicles and properties for them or loaned them large amounts of money; most did not have any written agreement with Pendleton; and they mainly paid Pendleton in cash.

After the Government did not offer any evidence in rebuttal, Pendleton renewed his motion for judgment of acquittal on all counts. The court again denied the motion on all counts except 3, 5, 9, and 14, for which it again deferred ruling.

During deliberations, the jury asked the court for clarification regarding an instruction on the structuring count. Over Pendleton's objection, the court reinstructed the jury on an aspect of it.

For the 15 counts, the jury found Pendleton guilty on nine: conspiracy to commit money laundering (count 2), money-laundering (counts 4, 5, 6, 8, and 12), structuring (count 13), and making a false statement on loan applications (counts 14 and 15). It acquitted him on the remaining six counts: conspiracy to distribute drugs (count 1), and money-laundering (counts 3, 7, 9, 10, and 11). The jury's forfeiture verdict found the assets involved in money laundering totaled $515,000; in structuring, $666,187.

Post-verdict, Pendleton orally renewed his motions for counts 3, 7, 9, and 14, for which ruling had been reserved. Because he had been acquitted on counts 3, 7, and 9, the motion for those counts was moot; the motion for count 14 was not considered. (As discussed *infra*, it was subsequently granted for lack of venue.)

Post-trial, Pendleton moved for judgment of acquittal, or for a new trial, under Rules 29(c) and 33, but challenged the sufficiency of the evidence only for counts 13, 14, and 15; asserted the court erred by reinstructing the jury on structuring (count 13); and claimed he should receive a new trial because at least one juror exhibited clear bias towards him. The court granted judgment of acquittal for count 14 (false statement on loan application) for lack of venue, but otherwise denied the motion.

No. 17-31007

At sentencing, the court, *inter alia*, adopted the presentence investigation report, and sentenced Pendleton to 121 months' imprisonment. The sentence was at the bottom of the advisory Guidelines sentencing range.

## II.

As noted, Pendleton raises numerous issues on appeal. He contests the sufficiency of the evidence for his eight counts of conviction; and, he asserts the district court erred in: failing to discharge a juror, correcting a jury instruction during jury deliberations, and calculating his advisory sentencing range.

## A.

When a sufficiency issue is preserved in a jury trial through a proper Rule 29 motion, the claim is reviewed *de novo*, "but with substantial deference to the jury verdict". *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018) (footnote and quotations omitted). For that review, all credibility determinations and reasonable inferences are resolved in favor of the verdict, *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995); and, in that regard, we do not assess the credibility of the witnesses, as that "is the exclusive province of the jury", *United States v. Greenwood*, 974 F.2d 1449, 1458 (5th Cir. 1992) (citation omitted). The evidence is sufficient "if a reasonable trier of fact could conclude . . . the elements of the offense were established beyond a reasonable doubt". *Suarez*, 879 F.3d at 630 (alteration in original) (footnote omitted).

If, however, a particular sufficiency issue was not preserved in district court, review is only for plain error. *Id.* Under plain-error review, defendant must "show a clear or obvious [plain] legal error that affects his substantial rights and 'seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings'". *Id.* (alteration in original) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). "In reviewing the sufficiency of the evidence, an error is 'clear or obvious' 'only if the record is devoid of evidence pointing to guilt, or . . . the evidence on a key element of the offense [i]s so tenuous that a conviction would be shocking.'" *Id.* at 630–31 (alterations in original) (citation omitted).

No. 17-31007

"Relief [based on a sufficiency-of-evidence challenge] is appropriate under this exacting [plain-error] standard only if the Government's evidence is '*obviously* insufficient' and . . . defendant shows 'a manifest miscarriage of justice.'" *Id.* at 631 (emphasis in original) (citation omitted).  As done for preserved claims, the evidence is viewed in the light most favorable to the verdict, drawing all reasonable inferences from the evidence to support the verdict.  *Id.* (citation omitted).

As discussed, Pendleton moved for judgment of acquittal pursuant to Rule 29(a) both after the Government rested and at the close of all the evidence, challenging the sufficiency of the evidence on all 15 counts.  Post-trial, Pendleton—in this instance, pursuant to Rule 29(c)— again moved for judgment of acquittal, but only challenged the sufficiency of the evidence for counts 13, 14, and 15.

This narrowing of contested counts presents the following issue:  having moved for judgment of acquittal on all counts pursuant to Rule 29(a), akin to Federal Rule of Civil Procedure 50, did Pendleton, post-trial, forfeit, or even waive, those Rule 29(a) challenges not reasserted in his Rule 29(c) motion?  Our court *sua sponte* raised this issue at oral argument and required briefing on the issue.

In response, Pendleton asserted his Rule 29(a) motion was properly preserved by re-raising it at the close of all the evidence, and his not reasserting all challenges in his Rule 29(c) motion had no effect.  The Government effectively did not take a position.

Rule 29(c) states:  "A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge".  Fed. R. Crim. P. 29(c)(3).  But, having made a Rule 29(a) motion, did Pendleton forfeit, or even waive, any of his claims by failing to reassert them in his Rule 29(c) motion?  The advisory committee notes state Rule 29 was originally constructed to operate similarly to Federal Rule of Civil Procedure 50.  Fed. R. Crim. P. 29 advisory committee's note to 1944

amendment. In 1966, however, Rule 29 was amended, with its being noted "several changes [were made] in the former procedure", deleting any mention of similarity to Rule 50, and deleting any requirement for a Rule 29(a) motion before filing a Rule 29(c) motion. Fed. R. Crim. P. 29 advisory committee's note to 1966 amendment.

> The second circuit has squarely addressed this issue:

> To preserve the sufficiency issue and avoid the burden of showing plain error, a defendant must have moved for judgment of acquittal either at the close of all the evidence pursuant to Rule 29(a) *or* post-trial in a motion pursuant to Rule 29(c). We find no case that requires the defendant to make both motions in order to preserve the issue or that treats as a forfeiture a failure to raise the sufficiency claim on the Rule 29(c) motion.

*United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997) (emphasis in original) (internal citations omitted). A recent unpublished opinion from the second circuit, however, has questioned that holding. *See United States v. Clare*, 652 F. App'x 32, 33–34 (2d Cir. 2016) (Defendant "may have failed to preserve his sufficiency challenge, at least as to [two counts], as his trial counsel did not raise the challenge as to those counts in his post-trial motion".).

In any event, we need not reach this issue. Even under a *de novo* standard of review for those counts not reasserted in his Rule 29(c) motion, Pendleton's sufficiency challenges fail.

In considering the sufficiency of the evidence, it is helpful to recount what evidence the jury considered. During the six-day trial, the jury, *inter alia*, heard testimony from 19 witnesses, and was presented with thousands of documents and audio recordings, including financial records, transcripts and recordings of telephone calls, photographs, and loan applications. Over four days, the Government presented 12 witnesses, including, as noted *supra*: three DEA agents involved in the investigation of Sorina and Pendleton; a financial analyst for the Department of Justice's Organized Crime Drug Enforcement Task Force; drug

No. 17-31007

dealers Sorina, Hardy, Smith, and Alexander; Pendleton's accountant; two employees of the Chevrolet dealership where Pendleton bought Sorina's Corvette; and a partner in the law firm at which Pendleton stated— on the loan application for the Corvette—he was employed as a manager.  On the fifth day of trial, Pendleton called seven witnesses, including his insurance agent and six people he helped with financing.

After considering all the evidence, the jury convicted Pendleton of nine counts and acquitted him of six.  (The court subsequently granted Pendleton's Rule 29(c) motion for count 14 for lack of venue.)

For seven of the counts on which he was convicted (2, 4, 5, 6, 8, 12, and 13), Pendleton was also convicted of aiding and abetting, in violation of 18 U.S.C. § 2. We need not consider that basis because, for the following reasons, the evidence was otherwise sufficient to convict Pendleton.

1.

Pendleton contests his conviction on count 5:  concealment money laundering, concerning the purchase of 109 Santa Cruz Court, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  (The house at 109 Santa Cruz Court is also the subject of the count 6 conviction for laundering drug proceeds, in violation of 18 U.S.C. § 1957.)  Pendleton was acquitted of all other charges for concealment money laundering (counts 3, 7, 9, and 11).  To obtain a conviction for such money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), "the government must prove that the defendant 1) conducted or attempted to conduct a financial transaction, 2) which the defendant knew involved the proceeds of unlawful activity, 3) with the intent" to design the transaction "to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity".  *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994) (citation and quotations omitted).

Pendleton asserts:  (1) he did not know Sorina or any other person involved in the conspiracy were drug dealers, thus he did not know he was dealing in illicit funds; and (2) the Government failed to prove he intended to conceal the sale of

8

No. 17-31007

109 Santa Cruz (design element) because the sale was publicly disclosed. The design element is addressed in this part; knowledge, in part II.A.2.

"To establish the design element, the government must demonstrate that the charged transactions had the purpose, not merely the effect, of 'mak[ing] it more difficult for the government to trace and demonstrate the nature of th[e] funds.'" *United States v. Valdez*, 726 F.3d 684, 690 (5th Cir. 2013) (alterations in original) (citation omitted). Nevertheless, "in order to establish the design element of money laundering, it is not necessary to prove with regard to any single transaction that . . . defendant removed all trace of his involvement with the money or that the particular transaction charged is itself highly unusual, although either of these elements might be sufficient to support a money laundering conviction". *United States v. Willey*, 57 F.3d 1374, 1386 (5th Cir. 1995) (citation and footnote omitted).

Concerning 109 Santa Cruz, Sorina testified that, in March 2013, Pendleton bought the property for him, initially registering it in Pendleton's name. Sorina had agreed to pay Pendleton $325,000 for the property ($300,000 for the house; $25,000 as Pendleton's fee). Pendleton paid only $280,000 for the property.

Between March 2013 and April 2014, Sorina paid Pendleton at least $100,000 for the house, reducing his balance to $225,000. In April 2014, Sorina decided it was time to transfer ownership of 109 Santa Cruz out of Pendleton's name and into Sorina's, believing he had accumulated enough legitimate rental funds in the Sorina Rental Properties account.

In any event, Sorina applied for a loan to buy 109 Santa Cruz from Pendleton. Sorina was approved by the bank for a $180,000 loan, not enough to cover his $225,000 balance on the purchase price. And, because he did not have sufficient legitimate funds in the bank to cover the $45,000 deficiency, Sorina gave Pendleton $20,000 in cash (drug proceeds), and Pendleton, in return, gave him a cashier's check in that amount to deposit in his account to enable making the down payment to the bank with legitimate money. The house appraised for around

9

No. 17-31007

$500,000, and Sorina testified the closing officer repeatedly asked how he was getting the house at such a discounted price, to which Sorina replied Pendleton was his uncle.

"'[A] series of unusual financial moves [culminating] in the transaction,' ha[s] been found to support an inference of an intent to conceal"; and "using a third party . . . to purchase goods on one's behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal". *Id.* at 1385–86 (alteration in original) (citation omitted). Pendleton relies on *Valdez*, which is distinguishable. In *Valdez*, our court noted: "Valdez did not use false names, third parties, or any particularly complicated financial maneuvers, which are usual hallmarks of an intent to conceal." *Valdez*, 726 F.3d at 690 (citations omitted). But here, Pendleton, acting as the third party in a complicated financial transaction, bought assets and washed drug money for Sorina to convert it into legitimate funds.

Viewing the evidence in the requisite light most favorable to the verdict, this transaction is sufficient for a reasonable trier of fact to find, beyond a reasonable doubt, that Pendleton designed the transaction to conceal or disguise the nature or source of drug proceeds. Again, Pendleton's challenge to the knowledge element for concealment money laundering (count 5) is discussed below.

2.

Pendleton's next sufficiency challenge concerns counts 2 (conspiracy to commit money laundering, 18 U.S.C. § 1956(h)), 4 (money laundering, 18 U.S.C. § 1957—Hayne Boulevard and St. Ferdinand Street apartments), 5 (concealment money laundering, 18 U.S.C. § 1956(a)(1)(B)(i)—109 Santa Cruz), 6 (money laundering, 18 U.S.C. § 1957—also 109 Santa Cruz), 8 (money laundering, 18 U.S.C. § 1957—2013 Porsche Cayenne GTS), and 12 (money laundering, 18 U.S.C. § 1957—2014 Chevrolet Corvette).

To obtain a conviction for money laundering under 18 U.S.C. § 1957, the Government must prove defendant engaged in a financial transaction involving a value greater than $10,000, knowing the monetary transaction involved criminally-derived property.  18 U.S.C. § 1957(a); *United States v. Pettigrew*, 77 F.3d 1500, 1513 (5th Cir. 1996).  Again, Pendleton contends the Government failed to prove he knew the transactions involved criminally-derived property because he did not know Sorina and others involved in the conspiracy were drug dealers. The knowledge element for the earlier-discussed count 5 (concealment money laundering for 109 Santa Cruz) is based on the same evidence and, accordingly, is discussed here.

As reflected above and *infra*, the sufficiency challenges to the money-laundering convictions fail.  Next addressed is the conspiracy count for such laundering.

To obtain a conviction for conspiracy to commit money laundering, "the government must prove (1) . . . there was an agreement between two or more persons to commit money laundering and (2) . . . defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose". *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) (citation omitted).  The indictment alleged two objects of the conspiracy:  concealment money laundering, under 18 U.S.C. § 1956(a)(1)(B)(i), and laundering drug proceeds, under 18 U.S.C. § 1957.  "Even if there was insufficient evidence as to one of the objects of the conspiracy, we will nonetheless uphold the conspiracy conviction if there was sufficient evidence as to the other object."  *Id.* (citation omitted).

Concerning Pendleton's knowledge, Sorina testified:  he told Pendleton early in their relationship he was a drug dealer; at least by the time Pendleton sold Sorina the Porsche in 2013, Pendleton knew Sorina was selling drugs; Pendleton began doing more business with Sorina after learning he sold drugs; and, with the exception of payments for the Hayne and St. Ferdinand properties,

for which Sorina partly paid Pendleton with rental proceeds, Sorina paid Pendleton exclusively in cash drug proceeds, sometimes up to $30,000 at a time.

Pendleton first attempted to help Sorina receive a loan for the Mercedes in 2011 and, in doing so, obtained Sorina's financial information, showing he only earned $2,500 a month at Boh Brothers, and would not qualify for traditional financing. (The Mercedes was not the subject of a charge, but the evidence of Pendleton's knowledge is applicable.) Therefore, at the time Sorina bought the Mercedes from Pendleton, he knew Sorina did not earn enough legitimate money to be able to afford $30,000 cash payments. Sorina testified he gave Pendleton a $7,000 cash deposit for the Mercedes; began making $1,500 monthly cash payments; increased his monthly cash payments to around $5,000, once he began selling heroin; and ultimately paid the balance due on the Mercedes with two cash payments of $30,000 and $28,000, respectively, for a total of $81,000.

In regard to the Porsche Pendleton bought for Sorina, he testified he provided Pendleton, all from drug proceeds, a $30,000 cash deposit, and three cash payments equal to $60,000, for a total of $90,000. Sorina testified that Pendleton, after receiving the $30,000 cash deposit, later joked he "almost caught a contact [high] off that money" because it had a strong odor of marihuana.

Sorina also testified he and Pendleton used code words: "applesauce" referred to drugs; "my children", to Sorina's dealers. Pendleton emphasizes neither he nor Sorina was heard talking about "applesauce" on any of the wiretaps. Sorina testified, however, that these conversations either occurred in 2013, a year before the wiretaps began, or occurred in person. Also the jury heard two recorded telephone conversations in which Pendleton referred to Sorina's "children" and "sons".

The jury also heard a recorded telephone conversation in which Pendleton stated: "If [drug-dealer Sanders] had any sense to do some things, that's what he needs to do, start concerts . . . . Then he's got an avenue to say that's where he made money from, you know?" From this, the jury could have reasonably inferred

No. 17-31007

Pendleton knew the source of this group's money and helped it devise schemes to launder it.

Pendleton asserts the only evidence proffered by the Government of his knowledge of the illicit nature of the money was the "self-serving testimony of Sorina, and other convicted drug dealers, nearly all of whom testified pursuant to plea agreements". Again, "[a]ll credibility determinations and reasonable inferences are to be resolved in favor of the verdict". *Resio-Trejo*, 45 F.3d at 911 (citation omitted). "We do not make credibility determinations in ordinary circumstances, even where evidence introduced against defendants is from their co-conspirators." *Garza*, 42 F.3d at 253 (citation omitted). As noted, "[a]ssessing the credibility of the witnesses . . . is the exclusive province of the jury". *Greenwood*, 974 F.2d at 1458 (citation omitted).

For the reasons Pendleton's sufficiency challenges to the substantive money-laundering convictions fail, so does his sufficiency challenge to the money-laundering-conspiracy conviction. Sorina testified Pendleton's role on his team was finance: he would buy anything Sorina and his associates wanted that they could not buy themselves because they did not have legitimate money. In sum, there was sufficient evidence for a reasonable juror to find Pendleton agreed to launder money with Sorina and others.

3.

Regarding the sufficiency challenge to the conviction for structuring (count 13), in violation of 31 U.S.C. § 5324, the Government must prove defendant knowingly structured a currency transaction in excess of $10,000 with the purpose to evade a financial institution's reporting obligation. 31 U.S.C. § 5324(a); *United States v. Nguyen*, 854 F.3d 276, 281 (5th Cir. 2017). (Financial institutions are required to report deposits of more than $10,000 to the Department of Treasury.) In this instance, a statutory sentencing enhancement was included, which required the Government to prove Pendleton structured transactions "while violating another law of the United States"—specifically, conspiracy to distribute

controlled substances or money laundering—or "as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period".    31 U.S.C. § 5324(d)(2).

Pendleton asserts the Government failed to prove he was complicit in any illegal activity, let alone a "pattern" of money laundering and drug trafficking.  As discussed *supra*, the evidence was sufficient for Pendleton's money-laundering conviction.

Further, the Government's financial analyst testified:    large cash transactions are a red flag for drugs and other illegal activities; most criminals and drug dealers interviewed by him understood a $10,000 cash deposit would trigger some notice to the Government; from 2012-2014, one-third of Pendleton's deposits were in cash, with over $1.5 million deposited in cash; during this period, not one of those cash deposits exceeded $10,000; and following Sorina's and Hardy's arrests in the summer of 2014, Pendleton deposited almost no cash.

Pendleton asserts this testimony was misleading, as the analyst did not investigate many of his sources of income.  The jury, however, was entitled to reject Pendleton's claims and could reasonably infer he knowingly structured transactions while engaged in money laundering.  *See*, *e.g.*, *Fuchs*, 467 F.3d at 905–06.  Therefore, the Government sufficiently proved Pendleton structured transactions both "while violating another law of the United States" and "as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period" (although the Government was only required to prove one of the two alternatives, as discussed *infra*).

4.

For the conviction for a false statement on a loan application (count 15—purchase of Corvette), in violation of 18 U.S.C. § 1014, the Government was required to prove:  (1) defendant knowingly made a false statement or report (2) to a federally-insured financial institution (3) for the purpose of influencing the institution's decision to extend credit.  18 U.S.C. § 1014; *United States v. Sandlin*,

No. 17-31007

589 F.3d 749, 753 (5th Cir. 2009).  The Government proved Pendleton told a salesman at the Corvette dealership that he worked for a law firm as a manager for nine years, making $150,000 annually (the statement).  This information was transferred to the loan application for Sorina's Corvette that Pendleton then signed.

A partner in that law firm testified Pendleton had never worked for it in any capacity, and the salesman testified he told Pendleton this was "information that the bank needed to approve him for a loan".  Furthermore, the application Pendleton signed contained the following provision:  "You are applying for individual credit in your own name and are relying on your own income or assets and not the income or assets of another person as the basis for repayment of the credit requested".

Pendleton contends the Government did not prove the statement was made for the purpose of influencing the institution's decision to extend credit because the dealership inflated his income even more and his credit qualified him for a loan within minutes.  Nevertheless, "the relevant inquiry concerns [defendant's] intent, not the bank's", and "it does not matter that the bank might have made the loans even without considering what was on the application".  *Sandlin*, 589 F.3d at 755 (citation omitted).

The jurors were "permitted to 'use their common sense and evaluate the facts in light of their common knowledge of the natural tendencies and inclinations as human beings'".  *Id.* (citation omitted).  Therefore, the Government presented sufficient evidence on which a reasonable juror could have found, beyond a reasonable doubt, that Pendleton made the false statements for the purpose of influencing the financial institution.  *See id.* at 754–55.

B.

Next at issue are the denials of Pendleton's motions for mistrial and a new trial, regarding claimed juror misconduct during the Government's case-in-chief. The denial of motions for mistrial and for a new trial, including those based on

15

No. 17-31007

juror bias or misconduct, are reviewed for abuse of discretion. *United States v. York*, 600 F.3d 347, 355 (5th Cir. 2010) (citing *United States v. Sharpe*, 193 F.3d 852, 861–62 (5th Cir. 1999)); *United States v. Villalobos*, 601 F. App'x 274, 277 (5th Cir. 2015) (citing *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001)).

"Deliberation prior to the close of evidence . . . threatens . . . defendant's Sixth Amendment right to trial by an impartial jury.  In evaluating a claim of juror misconduct, the law presumes . . . the jury is impartial and the burden rests on . . . defendant to show otherwise." *Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir. 2010) (citing *York*, 600 F.3d at 356–57).  "Judges have broad discretion to deal with possible jury misconduct . . . .  [Its] discretion is broadest when the allegation involves internal misconduct such as premature deliberations, instead of external misconduct . . . ." *York*, 600 F.3d at 356 (citations and quotations omitted).

In response to a report, following the Government's resting after its case-in-chief, that one juror told another that Pendleton was "sure happy for someone who's about to go to the federal penitentiary", the court interviewed each juror individually to determine whether any misconduct had occurred, and determined only jurors 9, 10, and 13 were involved.  Jurors 9 and 10 each recalled an offhand comment regarding Pendleton's laughing as he walked into the courthouse, and both recalled juror 9 stated he would not be able to act so calmly if he were facing federal charges or a federal trial.  Juror 13 was walking in front of them when the comment was made and swore juror 9 instead said "federal pen".  The court found all three jurors credible; but, it credited the fact that jurors 9 and 10 independently recalled the same context of the comment.  The court also asked all three if they could be fair and impartial; each answered affirmatively.

At that time, Pendleton moved to have both jurors 9 and 10 removed and for a mistrial, which the court denied.  Post-trial, Pendleton, *inter alia*, moved for a new trial because "at least one juror exhibited clear bias towards" him.  The court again denied the motion.

16

No. 17-31007

"In cases like this one, where jurors may have made premature expressions as to guilt, we generally defer to the district court's decision as to whether . . . defendant received a fair trial by an impartial jury, as the court is in 'a far better position to judge the mood at trial and the predilections of the jury' than is an appellate court that 'ha[s] only an insentient record before [it].'" *United States v. Collins*, 972 F.2d 1385, 1404 (5th Cir. 1992) (alterations in original) (footnote and citation omitted). "First, the district court must determine whether the juror actually made the statements in question. This determination necessarily requires the court to judge the credibility of the person who allegedly overheard the statement . . . ." *Id.* (footnote omitted). If the court determines the allegations are true, it must decide whether a new trial is required. *Id.* at 1404 n.36 (citation omitted).

Here, the court interviewed all the jurors, and then made a determination based on the statements and demeanor of the jurors that, although all three jurors were credible, the court believed jurors 9's and 10's recollections as to the context of the comment, and that no premature deliberations had occurred. Juror 9 stated he would want someone in his frame of mind to be on the jury if he were the defendant. The court stated it was "very comfortable that if any comments were made, it was one offhand comment. There was no discussion about the weight of the evidence or what the evidence was". As an extra measure, the court reminded the jury that Pendleton was entitled to a fair and impartial jury and not to deliberate before the close of evidence.

Pendleton has not shown the court abused its discretion in refusing to declare a mistrial or in denying his new-trial motion. *See id.* at 1403–04; *York*, 600 F.3d at 355–58; *Villalobos*, 601 F. App'x at 277.

C.

The earlier-discussed statutory structuring enhancement, 31 U.S.C. § 5324(d)(2), provides: "Whoever violates this section while violating *another law* of the United States *or* as part of a pattern of any illegal activity involving more

17

than $100,000 in a 12-month period . . . ", shall receive an enhanced penalty. 31 U.S.C. § 5324(d)(2) (emphasis added). The court originally instructed the jury that the Government must prove, *inter alia*, "defendant violated this [structuring] law while violating another law of the United States, specifically conspiracy to distribute controlled substances *and* money laundering, as part of a pattern of illegal activity involving more than $100,000 in a 12-month period". (Emphasis added.) In response to a jury question asking whether the Government had to prove conspiracy to distribute controlled substances *and* money laundering, or conspiracy to distribute controlled substances *or* money laundering, and over Pendleton's objection, the judge reinstructed the jury on that point, replacing the "and" with "or". (It bears noting the instruction also required proving the structuring violation occurred "while violating another law" *and*, rather than or, "as part of a pattern of illegal activity involving more than $100,000 in a 12-month period". Although the instruction was written in the conjunctive, the statute is in the disjunctive. This was not challenged by either party.)

Pendleton asserts reinstructing the jury was error because the original jury instruction was identical to the language used in the superseding indictment and was a correct statement of the law. The superseding indictment charged: "Pendleton did knowingly and for the purpose of evading the reporting requirements of [31 U.S.C. § 5313(a)], . . . structure and assist in structuring, . . . transactions with domestic financial institutions, and did so while violating other *laws* of the United States, that is, a conspiracy to distribute controlled substances *and* money laundering, and as part of a pattern of illegal activity involving more than $100,000 in a 12-month period". (Emphasis added.) Although the statute is disjunctive, it was proper for the Government to plead the acts conjunctively, because "an indictment . . . which charges the person accused, in the disjunctive, with being guilty of one or of another of several offenses, would be destitute of the necessary certainty, and would be wholly insufficient". *Price v. United States*, 150 F.2d 283, 284 (5th Cir. 1945) (citation omitted).

"When a deliberating jury expresses confusion and difficulty over an issue submitted to it, the trial court's task is to clear that confusion away with 'concrete accuracy.'" *United States v. Stevens*, 38 F.3d 167, 169–70 (5th Cir. 1994) (citations omitted). "Overall, we seek to determine whether the court's answer was reasonably responsive to the jury's questions and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." *United States v. Simkanin*, 420 F.3d 397, 406 (5th Cir. 2005) (quoting *United States v. Cantu*, 185 F.3d 298, 305–06 (5th Cir. 1999)).

"It is well-established in this [c]ircuit that a disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Haymes*, 610 F.2d 309, 310 (5th Cir. 1980) (citations omitted). In *Cantu*, our court found no error in the substance of the supplemental instructions, when, mid-deliberation and in response to a jury question, the court reinstructed the jury that the Government had to prove defendant "participated in the *management or operation* of a RICO enterprise, whereas the initial instruction charged the element in the conjunctive". 185 F.3d at 306 (emphasis in original). Our court was "satisfied that the district court's supplemental instructions were responsive to the jury's questions and allowed the jury to understand the issue presented to it". *Id.*; *see also United States v. Neuner*, 535 F. App'x 373, 377 (5th Cir. 2013) (holding there was no error in the court's correcting a misread instruction during deliberation in response to a jury question), *cert. denied*, 571 U.S. 1149 (2014).

Further, for the contested part of the statute, it requires defendant to have structured transactions, *inter alia*, "while violating another law". 31 U.S.C. § 5324(d)(2). "Law" is singular; therefore, the Government was required to prove violation of only one law: in this instance, either conspiracy to distribute controlled substances *or* money laundering. The court's answer to the jury question was "reasonably responsive to [it] and was a correct statement of the law". *Simkanin*, 420 F.3d at 408 (citation omitted).

No. 17-31007

D.

Although post-*Booker*, the Guidelines are advisory only, the district court must avoid significant procedural error, such as improperly calculating the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 48–51 (2007). If no such procedural error exists, a properly preserved objection to an ultimate sentence is reviewed for substantive reasonableness under an abuse-of-discretion standard. *Id.* at 51; *United States v. Delgado-Martinez*, 564 F.3d 750, 751–53 (5th Cir. 2009). In that respect, for issues preserved in district court, its application of the Guidelines is reviewed *de novo*; its factual findings, only for clear error. *E.g.*, *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). "A factual finding on a sentencing factor is not clearly erroneous so long as it is plausible in light of the record read as a whole." *United States v. Cessa*, 785 F.3d 165, 188 (5th Cir. 2015) (citation and quotations omitted).

The presentence investigation report (PSR) recommended: the amount of laundered funds was at least $673,533, but less than $1.5 million, resulting in a 14-level increase to Pendleton's offense level under Guideline § 2B1.1(b)(1)(H); he knew the laundered funds were proceeds of drug trafficking, resulting in a six-level enhancement under Guideline § 2S1.1(b)(1); and he was in the business of money laundering, resulting in a four-level enhancement under Guideline § 2S1.1(b)(2)(C). Therefore, the PSR recommended a total offense level of 32 (based on the calculation of the laundered funds and two enhancements) and a criminal history category of I; accordingly, Pendleton's recommended advisory Guidelines sentencing range was 121 to 151 months' imprisonment.

Pendleton objected to the calculation of the laundered funds, in the light of the jury's considerably smaller forfeiture finding, and to the two sentencing enhancements. The court overruled the objections, adopted the amended PSR, and sentenced Pendleton, *inter alia*, at the bottom of the advisory Guidelines sentencing range to 121 months' imprisonment.

No. 17-31007

1.

For Pendleton's challenge to the calculation of the total laundered funds, the "[c]alculation of [such] funds is a factual finding, which need only be determined by a preponderance of the evidence, and is reviewed only for clear error". *Cessa*, 785 F.3d at 188 (citation and quotations omitted).  In calculating the total amount of laundered funds, our precedent provides two options:  (1) "the entire amount the parties *intended* to launder"; or (2) "the broader amount that defendants could have been 'reasonably capable' of laundering".  *United States v. Delgado*, 608 F. App'x 230, 234 (5th Cir. 2015) (emphasis in original) (quoting *United States v. Leahy*, 82 F.3d 624, 638 (5th Cir. 1996); *United States v. Tansley*, 986 F.2d 880, 884 (5th Cir. 1993)).

Pendleton contends the court erred by including:  (1) $81,000, the value of the 2012 Mercedes-Benz, because Sorina testified Pendleton did not know he was selling drugs at the time he bought the vehicle; (2) $127,000 for the purchase and remodel of the 9400 Hayne property, because Sorina testified he paid in part with funds from his wife's lawsuit settlement; and (3) $21,000 in proceeds from drug profits, because Pendleton was acquitted of conspiracy to distribute drugs (count 1).

Regarding 9400 Hayne, Sorina testified he deposited his wife's lawsuit-settlement check in his account and immediately withdrew the money and invested it in drugs.  Sorina also testified:  on occasion, Pendleton kept the rent checks to pay down the balance on the 9400 Hayne and St. Ferdinand properties; and twice Pendleton wrote him a check for the rents, for $7,000 and $5,000, respectively, and Sorina paid him back in cash with drug proceeds.  Sorina would also supplement legitimate rental income in the Sorina Rental Properties account with drug proceeds.

The jury found the Government proved, beyond a reasonable doubt, that Pendleton laundered funds in connection with 9400 Hayne (count 4); and, in its forfeiture verdict, the jury found, by a preponderance of the evidence, that assets

involved in the count 4 money-laundering offense totaled $150,000 (the total purchase price of the 9400 Hayne ($60,000) and St. Ferdinand ($90,000) properties, and did not include the total $67,000 for the remodel of the properties).

Therefore, the court did not *clearly err* in finding 9400 Hayne involved at least $60,000 in laundered funds. And, based on Sorina's testimony, the court could have found, by a preponderance of the evidence, that the remodel was funded with drug proceeds. In addition, Guideline § 2S1.1 cmt. n. 3(B), states: "If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection (a)(2), is the total amount of the commingled funds". The total amount of the commingled funds for 9400 Hayne would be the entire $67,000 for the re-model and $60,000 for the purchase.

In regard to the 2012 Mercedes, worth $81,000, Sorina did testify he had not told Pendleton he was a drug dealer when Pendleton bought the vehicle. Sorina also testified, however, that he gave Pendleton all his financial information, and Pendleton knew he only earned $2,500 a month and, on those earnings, could not afford an $80,000 vehicle. Sorina gave Pendleton $7,000 cash as a down payment, $1,500 cash a month for a while, until he started paying around $5,000 cash a month, and finally paid it off with two cash payments of $30,000 and $28,000, respectively. The court could have found by a preponderance of the evidence that Pendleton knew he was being paid in drug money.

But, even if the $81,000 for the Mercedes, the $21,000 for the drug-investment profits, and the $20,000 from the Hayne property reflecting the amount of Sorina's wife's lawsuit settlement is deducted (Pendleton does not explain why the entire $127,000 for the Hayne property should be deducted when he only claims $20,000 was legitimate money), and using the amounts considered by the court, as presented in the Government's chart included in its response to Pendleton's objections to the PSR (the chart chronicles each payment tendered to

Pendleton by Sorina, based on his testimony), the total is still over $550,000. That is the amount necessary to receive the 14-level increase to his offense level under Guideline § 2B1.1(b)(1)(H). And, that is without considering $55,000 for the Bentley bought for Sanders, $32,000-$37,000 for the 2007 BMW bought for Hardy, or at least $65,000 for the 2014 Mercedes CLS 63 bought for Butler, all of which the court could have found, by a preponderance of the evidence, that Pendleton laundered.

"[T]he loss-amount and forfeiture-amount calculations are conceptually-distinct inquiries[, as Pendleton concedes]. The jury's forfeiture verdict did not address the amount of loss to be used in calculating [defendant's] sentence. Having addressed a different issue, the jury's verdict lacks preclusive effect". *United States v. Andradi*, 309 F. App'x 891, 893 (5th Cir. 2009) (citing *United States v. Harms*, 442 F.3d 367, 380 (5th Cir. 2006); *United States v. Monkey*, 725 F.2d 1007, 1010 (5th Cir. 1984)). Further, "[i]t is well established . . . that a 'jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence'". *Id.* (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997)). Pendleton has not shown the court clearly erred in calculating the total amount of laundered funds.

2.

Regarding the six-level enhancement for Pendleton's knowing the laundered funds were drug-trafficking proceeds, he contends: because the jury acquitted him of the drug conspiracy (count 1), the Government did not prove he knew those funds were such proceeds; and, therefore, the court improperly considered acquitted conduct.

For the enhancement to apply, however, the court needed only find, by a preponderance of the evidence, that Pendleton knew the laundered funds were the proceeds of drug sales, not that he participated in the drug conspiracy. *See* U.S.S.G. § 2S1.1(b)(1). Additionally, the jury found Pendleton guilty of multiple

No. 17-31007

counts (4, 6, 8, and 12) under 18 U.S.C. § 1957, which required the Government to prove, beyond a reasonable doubt, that he engaged in monetary transactions involving property derived from specified unlawful activity—in this case, the distribution of controlled substances.

The court did not clearly err in finding, by a preponderance of the evidence, that Pendleton knew the laundered funds were the proceeds of the distribution of drugs.

3.

For the four-level enhancement for being in the business of money laundering, Pendleton asserts the court improperly discounted the jury's forfeiture verdict, repudiated the jury's findings, and considered acquitted conduct by finding Pendleton was in such a business. Application note 4(B) to Guideline § 2S1.1 lists six non-exhaustive factors to be considered in determining whether defendant was in the business of laundering funds: (1) regularly engaged in laundering funds; (2) laundered funds during an extended period of time; (3) laundered funds from multiple sources; (4) generated a substantial amount of revenue in return for laundering funds; (5) had one or more prior convictions under specified statutes at the time he committed the offense; and (6) during the course of the investigation, made statements that he engaged in any of the conduct described in the other factors. U.S.S.G. § 2S1.1 app. n. 4(B). It is undisputed that neither the fifth nor sixth factors apply.

The court, in applying the factors, found: "over the period of a couple of years, [defendant] laundered funds from several drug dealers", including Sorina, Hardy, Butler, and Sanders; and "a substantial amount of money was made during the course of this process dealing with these drug dealers". Therefore, the court found factors one through four weighed in favor of finding Pendleton was in the business of money laundering.

As discussed *supra*, there was ample evidence to support this finding. Accordingly, the court did not clearly err in applying this enhancement.

24

No. 17-31007

E.

The Government notes a variance between the orally-pronounced sentence and the written judgment, and requests our court to either correct the sentence or remand to district court for it to do so. "Where the orally-imposed sentence conflicts with the written judgment, the oral pronouncement controls. Generally, we remand and direct the court to amend the written judgment to conform to the oral pronouncement. If, however, there is merely an ambiguity between the oral and written sentences, we review the entire record to determine the court's intent." *United States v. Garcia*, 604 F.3d 186, 191 (5th Cir. 2010) (citations omitted).

The written judgment imposes a total sentence of 121 months' imprisonment, consisting of "121 months as to Counts 2, 5, and 15; 120 months as to Counts 4, 6, 8, and 12; 60 months as to Count 13. All to run concurrently". But, at sentencing, the court stated: "It is the judgment of the Court that the defendant . . . is . . . to be imprisoned for a term of 121 months. The sentence consists of *120* [not 121, as imposed in the judgment] months as to each of Counts 2, 5, and 15; 120 months as to Counts 4, 6, 8, and 12; and 60 months as to Count 13, all to be served concurrently." (Emphasis added.) The court then explained that "[a] sentence of 121 [months] is imposed due to the seriousness and nature of the offense and . . . defendant's role in the offense and to protect the public and promote respect for the law".

Remand is unnecessary. In addition to the above statements by the court, the advisory Guidelines sentencing range was 121 to 151 months for counts 2, 5, and 15. The court at no point stated it was imposing a below-Guidelines sentence. In fact, it explained it "sentenced . . . defendant at the lower end of the [range] because the Court was impressed by the multiple letters from members of the community". As is clear from the entire record, the court intended for the sentence to total 121 months. *See id.*; *United States v. De La Pena-Juarez*, 214 F.3d 594, 601 (5th Cir. 2000) ("[I]t is the district court's intention that ultimately determines

No. 17-31007

the final judgment". (citation omitted)). This is reflected by Pendleton's conceding at oral argument that the sentence should be 121 months' imprisonment. Oral Argument 26:38–27:36.

III.

For the foregoing reasons, the judgment is AFFIRMED.